Sullivan
No. 2006-315

STEVEN J. SNELLING

v.

CITY OF CLAREMONT & a.

Argued: May 23, 2007
Opinion Issued: July 18, 2007

· *Backus, Meyer, Solomon & Branch, LLP*, of Manchester (*Jon Meyer* on the brief and orally), for the plaintiff.

*Nixon, Raiche, Vogelman, Barry & Slawsky, P.A.*, of Manchester (*David P. Slawsky* on the brief and orally), for the defendants.

GALWAY, J. The defendants, the City of Claremont (City) and its city manager, Robert Porter, appeal from a jury verdict in favor of the plaintiff, Steven J. Snelling, on his claims for wrongful termination and violation of his rights under the First Amendment to the United States Constitution. The plaintiff cross-appeals from the same verdict. We affirm in part, vacate in part and remand.

The following facts appear in the record. The plaintiff began working for the City as a contract assessor in 1993. In March or April 2000, Porter hired the plaintiff as the city assessor. During his first year on the job, the plaintiff was considered a "probationary" employee.

Soon after being hired as the city assessor, the plaintiff began to serve on the Tax Increment Finance (TIF) Committee, which was responsible for, among other things, preparing a report to submit to the State

regarding the finances of the City's tax increment district. In July 2000, the plaintiff abruptly resigned from the TIF Committee. Additionally, during the early months of his employment, the plaintiff testified on behalf of a social acquaintance at a Claremont Zoning Board of Adjustment hearing in opposition to the official position of his department.

In August 2000, the plaintiff was contacted by a reporter from the *Claremont Eagle Times* newspaper. The plaintiff participated in a series of interviews with the reporter and an article incorporating those interviews was published on August 27, 2000. In the article, the plaintiff is credited with "adding his voice" to those of others who had been claiming that the City's tax system was unfair, or otherwise flawed. Additionally, in the article the plaintiff indicated that certain members of the city council were taking unfair, but not illegal, advantage of the City's tax abatement system. Finally, the plaintiff was referenced as commenting on some of the efforts that had been made to correct the tax system's inequities and his role, or proposed role, in those changes.

Shortly after publication of this article, Porter met with city solicitor Jack Yazinski to discuss whether the plaintiff should be terminated. Yazinski asked Porter for a memorandum outlining why Porter believed the plaintiff ought to be terminated. After reviewing Porter's memorandum and conducting his own research, Yazinski informed Porter that there was no impediment to the termination. The plaintiff was terminated in September 2000. In the plaintiff's termination letter, Porter cited seven reasons for the termination: two concerned the plaintiff's testimony before the zoning board, one related to the TIF committee, and one concerned the plaintiff's comments in the newspaper article.

In September 2003, the plaintiff filed this action alleging wrongful termination against the City. The plaintiff also brought a claim against Porter under 42 U.S.C. § 1983 alleging that his termination violated his rights under the First Amendment. Following a trial, the jury found in favor of the plaintiff and awarded him $151,000 in past wages and benefits, $50,000 for mental and emotional distress, $151,200 in enhanced compensatory damages, and $3,780 in punitive damages. The jury awarded nothing on the plaintiff's claim for future lost wages and benefits. The Trial Court (*Hollman*, J.) denied the defendants' motions for remittitur and a new trial, as well as the plaintiff's motion for judgment notwithstanding the verdict. These appeals followed.

On appeal, the defendants contend that: (1) the plaintiff's First Amendment claim is barred by the recent United States Supreme Court decision in *Garcetti v. Ceballos*, 126 S. Ct. 1951 (2006); (2) if the First Amendment claim is not barred by *Garcetti*, the balancing test from *Pickering v. Board of Education*, 391 U.S. 563 (1968), weighs against the

plaintiff; (3) Porter is entitled to qualified immunity; (4) the superior court erred in various evidentiary rulings prior to and during trial; (5) the superior court erred in its instructions to the jury relating to Part I, Article 8 of the New Hampshire Constitution; (6) the plaintiff did not prove his wrongful termination claim; and (7) the superior court erred in refusing to remit the verdict based upon the municipal liability cap in RSA 507-B:4 (1997). The plaintiff cross-appeals the trial court's denial of his motion for judgment notwithstanding the verdict on his future wages and benefits, arguing that the defendants' closing argument tainted the jury's decision on this issue. We address each argument in turn.

## I. First Amendment

Because the first three issues raised by the defendants are intertwined, we address them together. The defendants first argue that the recent decision in *Garcetti* bars the plaintiff's action because there the Court "expressed its agreement with the argument made repeatedly by Mr. Porter and the City of Claremont in this case that plaintiff has no First Amendment claim under the circumstances presented." Second, the defendants contend that if *Garcetti* does not bar the plaintiff's case, *Pickering* does. Finally, the defendants contend that even if *Garcetti* and *Pickering* do not bar the plaintiff's case, Porter is entitled to qualified immunity. We note that because the plaintiff's claim involves only the First Amendment to the United States Constitution, we confine our analysis to the Federal Constitution.

A public employee's retaliation claim for engaging in activity protected by the First Amendment must be evaluated under a three-step process. *Guilloty Perez v. Pierluisi*, 339 F.3d 43, 51 (1st Cir. 2003); *Baldassare v. State of N.J.*, 250 F.3d 188, 194 (3d Cir. 2001). First, the plaintiff must establish that the activity in question was protected. *Baldassare*, 250 F.3d at 195. For this purpose, the plaintiff must speak as a citizen on a matter of public concern. *Id.*; *Connick v. Myers*, 461 U.S. 138, 147 (1983). The plaintiff then must demonstrate that his interest in the speech outweighs the state's countervailing interest as an employer in promoting the efficiency of the public services it provides through its employees. *Pierluisi*, 339 F.3d at 51; *Pickering*, 391 U.S. at 568. This evaluation of the employee's rights and the employer's interests is referred to as the *Pickering* balancing test. *Pierluisi*, 339 F.3d at 51. These determinations depend upon whether the employee's statements are of a character that the principles of the First Amendment protect and, therefore, are questions of law subject to *de novo* review. *Id.*

The second step requires the plaintiff to show that the protected activity was a substantial or motivating factor in the alleged retaliatory action. *Id.*;

*Mt. Healthy City Board of Ed. v. Doyle*, 429 U.S. 274, 287 (1977). Finally, the public employer can rebut the claim by demonstrating that it would have reached the same decision, absent the protected conduct. *Pierluisi*, 339 F.3d at 51. These final two steps present issues for the fact finder. *Baldassare*, 250 F.3d at 195.

The *Garcetti* decision focused upon the first factor in the above analysis—whether the speech at issue was delivered by a citizen on a matter of public concern. In *Garcetti*, an attorney in a Los Angeles County District Attorney's Office, Richard Ceballos, believed that a deputy sheriff had misrepresented information in an affidavit submitted with a search warrant application in a pending criminal case, and submitted a memorandum to his superiors outlining this conclusion. *Garcetti*, 126 S. Ct. at 1955-56. A meeting was held to discuss Ceballos' memorandum. *Id.* at 1956. Despite Ceballos' conclusion, his supervisors determined that the prosecution should proceed. *Id.* During a hearing before the trial court challenging the propriety of the warrant, Ceballos repeated his conclusion regarding the affidavit, but the court rejected the challenge. *Id.* Ceballos claimed that "in the aftermath of these events he was subjected to a series of retaliatory employment actions." *Id.*

The Supreme Court held "that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 1960. This is so because "[e]mployers have heightened interests in controlling speech made by an employee in his or her professional capacity." *Id.* In light of this conclusion, the Court determined that Ceballos was not entitled to First Amendment protection for his comments in the memorandum and before the trial court because they were made in the course of his official duties. *Id.* at 1961.

Because the parties in *Garcetti* did not dispute that Ceballos was acting pursuant to his employment duties, the Court noted that it had no occasion "to articulate a comprehensive framework for defining the scope of an employee's duties in cases where there is room for serious debate." *Id.* However, the Court rejected the suggestion that employers can restrict employees' rights by creating excessively broad job descriptions. *Id.* Instead, the Court stated that "[t]he proper inquiry is a practical one." *Id.* Because, according to the Court, formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, "the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First

Amendment purposes." *Id.* at 1962. With the above in mind, we turn to the case at hand.

We note first that in 1993, the United States Supreme Court adopted a rule of retroactivity for civil cases which states:

> When this Court applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate our announcement of the rule.

*Harper v. Virginia Dept. of Taxation*, 509 U.S. 86, 97 (1993). Accordingly, though *Garcetti* was decided after the jury's verdict in this case, it is still applicable.

The defendants argue that when the plaintiff spoke with the reporter for the *Claremont Eagle Times*, he was acting pursuant to his official duties, and, therefore, his comments were not insulated from discipline. The defendants contend that the plaintiff was acting pursuant to his official duties because: (1) the article indicated that the reason for the plaintiff's involvement was his position as city assessor; (2) his job description encompassed this type of activity; and (3) the plaintiff testified that he spoke to the reporter as part of his official duties. The plaintiff counters that the issue of his official duties was neither raised in the notice of appeal nor added by later motion, and is not, therefore, properly before us. Additionally, the plaintiff contends that if the matter is properly before us, he was not acting pursuant to his official duties.

The defendants' notice of appeal raises the issue of whether the trial court erred in its analysis and application of *Pickering*. In order to address *Pickering*, we must determine whether the plaintiff was speaking as a citizen, as the term has been defined in *Garcetti*. Accordingly, a ruling on the *Pickering* issue requires an analysis of the subsidiary question regarding the applicability of *Garcetti*. Thus, *Garcetti*, and the accompanying analysis of the plaintiff's official duties, is properly before us. *See* SUP. CT. R. 16(3)(b).

As noted, the defendants first contend that the plaintiff spoke pursuant to his official duties because the reason for his being interviewed for the article was his employment as the city assessor. Under *Garcetti*, however, it is the public employee's official job duties that are the relevant factor, not a third party's motivations for speaking with that employee. Therefore, this argument does nothing to demonstrate whether the plaintiff's comments were made pursuant to his official duties.

■ Next, the defendants argue that the plaintiff's job description establishes that he was the City's highest tax official and that as part of his duties he was required to communicate with the public about local tax issues. While we are mindful that the existence of a requirement in one's job description does not compel a particular finding and that the proper inquiry in these situations is a practical one, *see Garcetti*, 126 S. Ct. at 1961-62, our review of the plaintiff's job description does not reveal support for the defendants' position. The plaintiff's job description summarizes the nature of the job of city assessor and then lists examples of the duties to be performed. Item four on the list of examples is the only one which could be read as requiring the plaintiff to communicate with the public. That item states that a duty of the position is to explain to property owners and others the procedures and techniques used by the assessor's office in "revaluation, abatements, exemptions, and effect of new or proposed construction on assessed values." This item does not indicate that the plaintiff is required to communicate with the public on any matter other than the office's procedures and techniques. Thus, while communication with the public about the office's procedures and techniques would fall within his duties, comments about the fairness of the tax system, or that identify potential abuses of that system, do not fall within his duties as described. Therefore, we cannot say that merely because the plaintiff spoke with a newspaper reporter about issues relating to taxation, his speech was part of his official duties as defined in his job description.

Finally, the defendants contend that the plaintiff testified that speaking to the reporter was done pursuant to his official duties. During trial, the plaintiff had the following exchange with his attorney:

Q. And in your opinion, was it part of your job duties as an assessor to communicate to the public enough information about property valuation that they could make an intelligent decision as to whether or not to apply for an abatement?

A. Absolutely.

Q. And in your opinion, did the article contribute to that goal?

A. Yes, it did.

The plaintiff contends that while he agreed with a question about whether the article had the effect of contributing to the goal of communicating with the public, he did not testify that speaking with the reporter generally, or that expressing his opinions about the fairness of the tax system, were included in his job duties. We agree.

■ While it may have been part of the plaintiff's official duties to communicate with the public about issues relating to property valuation and assessments, the opinions expressed in the article do not provide such information. While some comments in the article could be read as providing members of the public information about property valuation, the "adding of his voice" to other comments critical of the tax system served no such purpose. The majority of the plaintiff's comments in the article concerned the shortcomings of the City's tax system and the ways in which some people were able to take advantage of it. In other words, the plaintiff added his opinions about the tax system, and how it was used, to the opinions of others. In this way, the plaintiff's comments were like the protected expressions made by the speaker in *Pickering*, whose communication with a newspaper had no official significance and bore similarities to communications submitted by numerous citizens everyday. *See id.* at 1960. Thus, regardless of the plaintiff's understanding of the purpose of the article and his role therein, we conclude that when he spoke with the reporter, he was speaking as a citizen and not pursuant to his official duties. His First Amendment claim is not, therefore, barred by *Garcetti*.

■ We turn now to the remainder of the first step in the First Amendment analysis required by *Pickering*. We next determine whether the plaintiff spoke on a matter of public concern. A public employee's speech involves a matter of public concern if it can fairly be considered as relating to any matter of political, social or other concern to the community. *Connick*, 461 U.S. at 146; *Baldassare*, 250 F.3d at 195. If an employee speaks out only on a matter of personal interest, the First Amendment value of his words is low. *Pierluisi*, 339 F.3d at 51. Whether the speech addresses a matter of public concern is determined from the content, form, and context of the statements as revealed by the whole record. *Connick*, 461 U.S. at 147-48. Based upon our review of the record, we conclude that when the plaintiff spoke to a newspaper reporter about the fairness of the City's tax system and possible abuses of it, he spoke on a matter of public concern.

Next, we consider whether the City had an adequate justification for treating the plaintiff differently from any other member of the general public. *Garcetti*, 126 S. Ct. at 1958. To do so we must consider whether the plaintiff's interest in his speech outweighs the City's interest in promoting the efficiency of the services it provides through its employees. *Pickering*, 391 U.S. at 568.

We look first to the plaintiff's side of the scale to assess the interests served by his First Amendment activity, including his interests in

communicating, and the interests of the community in receiving, information on matters of public importance. *Mihos v. Swift*, 358 F.3d 91, 107 (1st Cir. 2004); *see also O'Connor v. Steeves*, 994 F.2d 905, 915-16 (1st Cir. 1993). "On the employee's side of this balance, the public's interest in exposing potential wrongdoing by public employees is especially powerful. ... Moreover, the public's substantial interest in unearthing governmental improprieties requires courts to foster legitimate whistleblowing." *Baldassare*, 250 F.3d at 198 (quotation omitted).

Here, the scale weighs heavily in favor of the plaintiff. In the article, the plaintiff recounted various efforts, including his own, to reform a tax system that he believed to be unfair. While he did make some comments that could have been motivated by self-interest, the overall tenor of the plaintiff's comments was directed at the functioning of the City's tax system. Further, the plaintiff described how at least one city councilor had been made aware, and taken advantage of, certain tax abatements not known to others. We conclude that the "strong public interest in such disclosures supplements [the plaintiff's] relatively slight personal interest in speaking out, heavily weighting the *Pickering* scale in favor of First Amendment protection against retaliation for [the plaintiff's] speech." *O'Connor*, 994 F.2d at 916 (emphasis omitted).

Turning to the defendants' side of the balance, we consider whether the expression impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise. *Rankin v. McPherson*, 483 U.S. 378, 388 (1987). "In calibrating the significance of the disruption, the relationship between the employer and the employee is particularly important." *Baldassare*, 250 F. 3d at 198. "Specifically, we must look to the proximity within an organizational hierarchy as a significant factor in the employer's demonstration that a public employee's speech had a detrimental impact on a necessarily close working relationship." *Id.* (quotation and brackets omitted). When evaluating the impact of an employee's statements on the trust relationship, *Pickering* "explicitly recognizes that some public employees will inevitably make erroneous statements while engaging in public comment, and that those statements may embarrass or even harass their government employers." *Brasslet v. Cota*, 761 F.2d 827, 845 (1st Cir. 1985). "It is axiomatic, therefore, that an employer may not be allowed to claim that his essential trust relationship with an employee was eroded solely by virtue of the employee's statements. There must be an additional and independent showing of actual and significant harm." *Id.* at 845-46.

■ The defendants argue that the plaintiff's actions conflicted with and subverted the relationship of trust and confidence he had with Porter. Other than the alleged loss of trust and confidence of Porter, however, the defendants do not point to any disruptions in the working environment. Porter and Yazinski both testified that they were not aware of any disruptions in the functioning of City government as a result of the article. Moreover, the only person named by the plaintiff as taking advantage of the system was a member of the city council with whom the plaintiff had no direct working relationship. Thus, the only disruption to which the defendants point is that caused by Porter's loss of trust, which does not weigh heavily on the *Pickering* balance. *See id.* Accordingly, we conclude that the balance weighs in favor of the plaintiff and that his speech was protected activity. Additionally, we note that the defendants do not challenge the conclusions relative to the final two factors of the retaliation analysis—that the protected activity was a substantial or motivating factor, and that the City would not have acted as it did absent the protected speech—thus, we do not address them. We conclude, therefore, that the trial court's determinations under *Pickering* were correct.

■ The defendants next contend that Porter is entitled to qualified immunity. "Government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Mihos*, 358 F.3d at 101-02 (quotation omitted). The trial court's denial of qualified immunity is a legal question, which we review *de novo. Id.* at 102; *see also Jarrett v. Town of Yarmouth*, 331 F.3d 140, 146 (1st Cir.), *cert. denied*, 540 U.S. 1017 (2003). Drawing upon United States Supreme Court precedent, the First Circuit employs the following test to determine whether a public official is entitled to qualified immunity: (1) whether the plaintiff has established a constitutional violation; (2) whether that right was clearly established at the time of the violation; and (3) whether a similarly situated reasonable official would have understood the constitutional right at issue. *Mihos*, 358 F.3d at 102; *see also Porter v. City of Manchester*, 151 N.H. 30, 48 (2004) (setting out test from *Mihos*). Because a determination on the first criterion requires application of the First Amendment retaliation test, and because we have already determined that the plaintiff has established a constitutional violation under that test, we conclude that the first factor has been met.

Turning to whether the plaintiff's First Amendment right was clearly established, we note that this inquiry seeks to discover whether the right was reasonably well settled at the time of the challenged conduct. *Mihos*,

358 F.3d at 109. This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition. *Id.*; *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

The defendants appear to argue that because this area of the law is so unclear, there is no reasonable basis to conclude that the law on this issue has been clearly established. This argument is not unlike that raised by the defendant in *Mihos* that when a right is subject to a balancing test, it can rarely be considered clearly established, at least in the absence of closely corresponding factual and legal precedent. *Mihos*, 358 F.3d at 109. We do not find this argument persuasive.

■ Here, the plaintiff was terminated, at least in part, for speaking to a newspaper reporter about the fairness of the City's property tax system and the manner in which at least one member of the city council was unfairly taking advantage of that system. Like the plaintiff in *Pickering*, the plaintiff here spoke directly to the public on a matter of substantial public concern by "adding his voice" to other public complaints. We conclude that the facts here are sufficiently analogous to those in *Pickering* that the plaintiff's First Amendment right to speak was clearly established. *See Suboh v. District Attorney's Office of Suffolk*, 298 F.3d 81, 94 (1st Cir. 2002).

Finally, we analyze whether an objectively reasonable official in Porter's position would have understood his actions to have violated the plaintiff's rights. *Mihos*, 358 F.3d at 110. Thus, even though the plaintiff has established a constitutional violation, Porter is still entitled to immunity if his mistake about what the law requires was objectively reasonable. *Id.* The defendants contend, based upon *V-1 Oil Co. v. State of Wyo. Dept. of Env. Quality*, 902 F.2d 1482 (10th Cir.), *cert. denied*, 498 U.S. 920 (1990), that because Porter relied upon the advice of Yazinski, the city solicitor, prior to terminating the plaintiff, there is no basis to conclude that he acted unreasonably.

■ We find *V-1* distinguishable. In *V-1*, a state official was found to have qualified immunity because he relied upon the advice of counsel. *Id.* at 1489. One of the bases for the court's determination was that the advice relied upon was given by attorneys fully informed of the factual and legal issues in the case and who could, therefore, tailor their advice to the specific facts of the controversy. *Id.* Here, by contrast, Porter testified that when he discussed the plaintiff's termination with Yazinski, the issue of the plaintiff's First Amendment rights did not come up. Also, Yazinski testified that although he thought about the issue of the plaintiff's First Amendment rights, he never discussed the issue with Porter. This was so, according to Yazinski, because he was operating under the belief that the

plaintiff's termination was unrelated to the article. We conclude from this testimony that because Yazinski was not sufficiently aware of the reasons for the plaintiff's termination, unlike *V-1*, his legal advice could not be appropriately tailored to the facts of the controversy. Accordingly, we do not agree that under *V-1*, Porter is automatically insulated from liability by the receipt of legal advice, and we conclude that the trial court did not err in denying Porter's request for qualified immunity.

## II. Evidentiary Rulings

The defendants challenge several rulings by the trial court. First, according to the defendants, they requested that the trial court instruct the jury on the *Pickering* test so that it could understand Yazinski's conclusion, but the trial court erroneously refused to give the instruction. Additionally, they contend that the trial court erroneously prevented them from informing the jury about the *Pickering* test in their closing arguments and erroneously prevented them from questioning Yazinski about his understanding of First Amendment issues at stake. Finally, they contend that the trial court improperly denied them the opportunity to question Steve Griffin, who was the part-time planning and economic development director for the City, about his understanding of the First Amendment issues in this case. According to the defendants, these errors resulted in the jury being misled about the termination and its connection to the article. The plaintiff contends that the defendants' arguments are either not preserved or lack merit.

A jury charge is sufficient as a matter of law if it fairly presents the case to the jury such that no injustice is done to the legal rights of the parties. *Kelleher v. Marvin Lumber & Cedar Co.*, 152 N.H. 813, 834 (2005). In a civil case, we review jury instructions in context and will reverse if the charge, taken in its entirety, fails to explain adequately the law applicable to the case in such a way that the jury could have been misled. *Id.* Here, the defendants contend that the trial court erred by not instructing the jury on the *Pickering* balancing test. Even assuming this issue was preserved, the balancing of interests under *Pickering* is an issue of law for the court. *Pierluisi*, 339 F.3d at 51. Therefore, the trial court did not err by not including the *Pickering* test in its charge to the jury. For the same reason, we conclude that it was not error for the trial court to prohibit the defendants from presenting the *Pickering* test to the jury during closing arguments.

As to the testimony of Yazinski and Griffin, a trial court's ruling about the introduction of evidence or the scope of cross-examination will not be overturned absent an unsustainable exercise of discretion. *Blagbrough*

*Family Realty Trust v. A & T Forest Prods.*, 155 N.H. 29, 40 (2007). To establish an unsustainable exercise of discretion, the defendant must demonstrate that the trial court's ruling was clearly untenable or unreasonable to the prejudice of his case. *Id.*

The defendants contend that Yazinski was not permitted to testify about his analysis of the relevant First Amendment issues even though Porter relied upon that analysis when deciding whether to terminate the plaintiff. Yazinski, however, testified that he considered the First Amendment and its implications, but that he did not discuss them with Porter because he believed the plaintiff's termination was unconnected to the article and thus unconnected to the plaintiff's First Amendment rights. Additionally, Yazinski testified that he concluded that the First Amendment did not bar the plaintiff's termination. Therefore, while Yazinski might not have testified in the manner the defendants desired, he did testify about his analysis of the First Amendment and the conclusions he reached from that analysis. Accordingly, we conclude that the defendants have not shown that the trial court's ruling relative to Yazinski's testimony was an unsustainable exercise of its discretion.

As for Griffin's testimony, the trial court prevented the defendants from asking Griffin whether he believed terminating the plaintiff would violate the First Amendment because he had not been disclosed as an expert witness and because no foundation was laid for his opinion testimony. On appeal, the defendants argue that New Hampshire Rule of Evidence 701, which allows certain non-expert opinion testimony when it is based upon the witness's perception and is "helpful to a clear understanding of the testimony or the determination of a fact in issue," permitted Griffin to testify about his evaluation of the First Amendment.

During trial, the defendants asked Griffin whether he believed the plaintiff's termination violated the First Amendment. Before he could answer, the plaintiff objected. At the ensuing bench conference, the parties debated whether Griffin had been disclosed as an expert and whether a proper foundation had been laid for his testimony. At the end of the conference, the trial court found that the defendants were "trying to present him as some sort of an expert and there's been no disclosure." The defendants responded: "Okay, all right, fair enough." At no point during the conference did the defendants contend that Griffin was entitled to give non-expert opinion, nor did the defendants object to the trial court's ruling that he was being presented as an expert without proper disclosure.

 "It is well established that a party must make a specific and contemporaneous objection during trial to preserve an issue for appellate review." *Cloutier v. City of Berlin*, 154 N.H. 13, 22 (2006). This

requirement affords the trial court an opportunity to correct any error it may have made and is grounded in common sense and judicial economy. *Id.* Here, the defendants never objected to the trial court's determination that Griffin was being called upon to testify as an expert without proper disclosure, but instead stated that the trial court's ruling was "fair enough." Accordingly, we conclude that the issue of Griffin's testimony has not been preserved for our review.

### III. Part I, Article 8

The defendants next contend that the trial court erred in its instructions to the jury regarding Part I, Article 8 of the New Hampshire Constitution. According to the defendants, because the plaintiff had expressly waived his only claim under the New Hampshire Constitution, there was no need to instruct the jury on that provision. The defendants further contend that the trial court's error was compounded when Part I, Article 8 was given special emphasis during the jury instructions and was later typed and submitted to the jury during its deliberations in a manner meant to favor the plaintiff. The plaintiff counters that during trial he asserted that there was a public policy in New Hampshire in favor of informing citizens about matters of public concern and that including Part I, Article 8 in the jury instructions was meant to aid the jury in determining whether such a policy existed. Additionally, the plaintiff argues that the defendants never objected and, therefore, the issue is not preserved.

As noted, it is well established that a party must make a specific and contemporaneous objection during trial to preserve an issue for appellate review. *Id.* All objections to a jury charge are waived unless taken on the record before the jury retires. *Carlisle v. Frisbie Mem. Hosp.*, 152 N.H. 762, 778 (2005).

Here, although the defendants argue that the trial court's instruction on Part I, Article 8 was given over their objection, they point to no place in the record where such objection was raised and our review of the record does not reveal any objection. We are likewise unaware of any objection to the submission of the constitutional provision to the jury during its deliberations. Accordingly, because no objections were made on the record, we consider the issue waived.

### IV. Wrongful Termination

The defendants next argue that to prove his claim for wrongful termination, the plaintiff had to demonstrate the existence of bad faith, and that "the primary thrust of the bad faith-retaliation theory was the misguided First Amendment claim." According to the defendants, absent reliance upon the plaintiff's First Amendment claim, the jury had no basis

to uphold the plaintiff's wrongful termination claim. The plaintiff counters that this issue is not properly before us, but, even if it is, it is erroneous.

Assuming for purposes of this opinion that the issue has been preserved, we reject the defendants' argument. According to the defendants, the plaintiff's wrongful termination case was based upon his "misguided" First Amendment claim. As we have held, however, the plaintiff's First Amendment claim was not misguided or meritless and the jury could properly rely upon it. Accordingly, we will not overturn the jury's verdict on the plaintiff's wrongful termination claim.

## V. Municipal Liability

The defendants' final argument is that the trial court erred in failing to remit the verdict based upon the municipal liability cap in RSA 507-B:4. According to the defendants, RSA 507-B:4 limits the amount of damages available to the plaintiff under state law to $150,000, but does not limit the amount of damages available under federal law. To that end, the defendants argue that the awards given for the plaintiff's wages and benefits, his emotional distress, and enhanced compensatory damages are limited, while the punitive damages, attorney's fees and expert fees are not. The plaintiff, in turn, agrees that the award for enhanced compensatory damages is subject to the RSA 507-B:4 cap, but contends the remaining damages are not. Also, the plaintiff argues that a determination of the actual amount available under state law is not yet ripe for our review.

RSA 507-B:4, I, states, in relevant part: "Liability of a governmental unit for bodily injury, personal injury or property damage sustained by any one person in actions brought under this chapter is limited to $150,000." However, RSA 507-B:7-a (Supp. 2006) provides:

> It shall be lawful for the state or any municipal subdivision thereof, including any county, city, town, school district, school administrative unit or other district, to procure the policies of insurance described in RSA 412. In any action against the state or any municipal subdivision thereof to enforce liability on account of a risk so insured against, the insuring company or state or municipal subdivision thereof shall not be allowed to plead as a defense immunity from liability for damages resulting from the performance of governmental functions, and its liability shall be determined as in the case of a private corporation except when a standard of care differing from that of a private corporation is set forth by statute; provided, however, that liability in any such case shall not exceed the limits of coverage

specified in the policy of insurance or as to governmental units defined in RSA 507-B, liability shall not exceed the policy limit or the limit specified in RSA 507-B:4, if applicable, *whichever is higher*, and the court shall abate any verdict in any such action to the extent that it exceeds such limit.

(Emphasis added.)

The parties agree that to the extent any award to the plaintiff was based upon federal law, it is not subject to the cap in RSA 507-B:4. The parties also agree that the plaintiff's award of enhanced compensatory damages was made under state law, and that the award of punitive damages was made under federal law. The parties disagree as to whether the plaintiff's award of past wages and benefits and his award of emotional and mental distress damages were given under federal law or state law.

Our review of the record does not clarify the issue. The jury in this case was given a special verdict form that required specific findings on the plaintiff's two claims and on each item of damage to be awarded. The only damages tied to specific claims were for enhanced compensatory damages and punitive damages, the only items not implicated in this debate.

We are unaware of any precedent directly on point. Several courts have held that state law limitations on damages may not be applied to claims under § 1983. *See, e.g., Thompson v. Village of Hales Corners,* 340 N.W.2d 704, 711 (Wis. 1984); *Rogers v. Saylor,* 760 P.2d 232, 238-39 (Or. 1988); *see also* 4 I. E. BRODENSTEINER & R. LEVINSON, STATE & LOCAL GOVERNMENT CIVIL RIGHTS LIABILITY § 10:5, at 149-50 (Supp. 2007). Additionally, we note that when a state law claim is joined with a § 1983 claim, "courts have been careful to avoid a double recovery for the same actual damage, whether special or general." 1 S. NAHMOD, CIVIL RIGHTS AND CIVIL LIBERTIES LITIGATION: THE LAW OF SECTION 1983 § 4:1, at 4-5 (4th ed. 2006). Applying these general principles, we conclude that when a suit against a governmental unit involves both claims under § 1983 and claims under state law, the claims under § 1983 are not subject to the cap in RSA 507-B:4, and that a plaintiff is not entitled to a double recovery. This conclusion is in accord with our jurisprudence that a plaintiff cannot claim multiple recoveries for the same loss even though different theories of liability are alleged. *See Philips v. Verax Corp.,* 138 N.H. 240, 248-49 (1994); *Transmedia Restaurant Co. v. Devereaux,* 149 N.H. 454, 461-62 (2003).

Here, although the jury's special verdict form does not indicate whether, for example, the damages awarded to the plaintiff on his claim for lost wages were given under state or federal law, both of the plaintiff's

theories arise from the same set of operative facts, *i.e.*, retaliation for speaking with a newspaper reporter. Thus, even though he has alleged multiple theories of recovery, the plaintiff is entitled to only a single recovery for his lost wages. Because the verdict form does not indicate the theory or theories under which the award was made, and because the plaintiff prevailed on both theories, it is reasonable to conclude that the award was made under each theory of liability. Since, however, the plaintiff may collect only one award, and since an award under federal law is not subject to the cap in RSA 507-B:4, it is that award the plaintiff ought to collect. Allowing the plaintiff to collect the award given under federal law, because it is not subject to the cap, will better advance the purpose of damages; *i.e.*, putting the plaintiff as nearly as possible in the same position he would have been had the injury not occurred. *Philips*, 138 N.H. at 248. This same analysis applies to the award for the plaintiff's mental and emotional distress. Accordingly, we conclude that the plaintiff is entitled to collect the damages awarded by the jury for lost wages and emotional distress without regard to the cap in RSA 507-B:4.

We address briefly the application of RSA 507-B:4 to the plaintiff's award of enhanced compensatory damages under state law. The plaintiff was awarded $151,200 in enhanced compensatory damages. As quoted above, RSA 507-B:7-a provides that if a municipality has insurance, the amount of recovery is capped at either $150,000 under RSA 507-B:4, or at the insurance policy limit, whichever is higher. The defendants are currently pursuing insurance coverage through a declaratory judgment action. Thus, it has not yet been ascertained whether insurance coverage exists, and, therefore, the limit of the defendants' liability on the award for enhanced compensatory damages cannot yet be determined. Accordingly, this issue is not ripe for review.

*VI. Future Wages and Benefits*

The plaintiff's sole claim on his cross-appeal is that during his closing argument the defendants' attorney appealed to the personal biases of the jurors. According to the plaintiff, this resulted in the jury awarding no money for future lost wages and benefits, a result that was inconsistent with the remainder of the award.

During his closing argument, the defendants' attorney stated:

> I can't tell you why Mr. Snelling told us repeatedly that his greatest concern was for the taxpayers of Claremont when in this case he's asking you to make a big money award that will be paid by Bob Porter and those same Claremont taxpayers. If Mr.

> Snelling gets the kind of award he's asking for, the taxpayers will pay twice for the work of city assessor over a 20 year period.

The plaintiff then objected, but was overruled and the defendants' attorney continued: "Once for Mr. Snelling and once for those people who actually do the job." The trial court gave no curative instruction, but during its general instruction to the jury stated that it was to decide the case "without sympathy, prejudice, fear or favor, for or against any party."

The plaintiff argues that the sole reason for the defendants' attorney's comments was to warn jurors that "they, their friends and relatives, would have to pay for any judgment awarded, and that in particular, an award of front pay damages would burden them with paying for two salaries for the next twenty years." According to the plaintiff, these comments were irrelevant, asserted facts not in evidence, and prejudiced the jury. Therefore, the plaintiff contends, the jury's award of no money for lost future wages ought to be vacated. We agree.

"During closing argument, counsel may not appeal to passion, prejudice or sympathy in a way not supported by the evidence." *Walton v. City of Manchester*, 140 N.H. 403, 406 (1995) (quotation omitted). "For example, the general rule is that the unnecessary mention of insurance is reversible error." *Id.* (quotation omitted).

Here, the defendants' attorney's statements were unnecessary for the jurors to decide the issues before them and were designed to appeal to their bias or prejudice. Moreover, it is, at best, unclear what the effect upon the City's taxpayers of having to pay the plaintiff's future lost wages would be, or how that relates to the evidence presented at trial. Commenting on the potential financial impact to a defendant of having to pay an award is not unlike mentioning the availability of insurance coverage. We conclude, therefore, that the defendants' attorney's comments were improper and that the jury's award of no money for lost future wages must be vacated.

For the above reasons, the jury's award relating to the plaintiff's future wages and benefits is vacated and the case remanded for further proceedings consistent with this opinion. In all other respects, we affirm.

*Affirmed in part; vacated in part; and remanded.*

DUGGAN, J., concurred; MOHL, J., retired superior court justice, specially assigned under RSA 490:3, concurred.