# IN THE SUPREME COURT OF TENNESSEE
## AT NASHVILLE
### February 2, 2011 Session

## DOROTHY KING ET AL. V. VIRGINIA BETTS ET AL.

**Appeal by Permission from the Court of Appeals**
**Chancery Court for Davidson County**
No. 06-943-I      Claudia Bonnyman, Chancellor

---

**No. M2009-00117-SC-R11-CV - Filed on November 18, 2011**

---

This appeal involves the assertion of the qualified immunity defense in a 42 U.S.C. § 1983 (2008) action filed in state court. A registered nurse employed at a state psychiatric facility publicly disagreed with a change in the facility's procedures for administering prescription medications at night and on the weekend. When the facility declined to change its procedures, the nurse filed a 42 U.S.C. § 1983 action in the Chancery Court for Davidson County against various officials and employees of the then Tennessee Department of Mental Health and Developmental Disabilities, alleging the existence of a hostile work environment and retaliation for the exercise of her constitutionally protected free speech rights. The defendants filed a motion for summary judgment on the nurse's First Amendment claim and a motion for judgment on the pleadings asserting qualified immunity. The trial court, after considering the products of two years of discovery, granted both of the defendants' motions and dismissed the nurse's complaint. The Court of Appeals reversed the trial court with regard to both motions based on its conclusion that material issues of fact precluded both motions. *King v. Betts*, No. M2009-00117-COA-R3-CV, 2009 WL 4893590 (Tenn. Ct. App. Dec. 18, 2009). We granted the defendants' Tenn. R. App. P. 11 application for permission to appeal to address the procedure for the consideration of qualified immunity defenses in 42 U.S.C. § 1983 actions filed in Tennessee's courts and to determine whether the defendants were entitled to qualified immunity on the facts of this case. We have determined that the defendants are entitled to qualified immunity because the nurse has failed to demonstrate that the defendants' response to her criticism of the changes in the procedures for administering prescription medications violated a clearly established right.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Appeals Reversed**

WILLIAM C. KOCH, JR., J., delivered the opinion of the Court, in which CORNELIA A. CLARK, C.J., and SHARON G. LEE, JJ., joined. JANICE M. HOLDER, J., filed a separate concurring opinion. GARY R. WADE, J., not participating.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael E. Moore, Solicitor General; John W. Dalton, Senior Counsel, for the appellants, Virginia Betts, Lynn McDonald, Dr. Lindsey Douglas, and Glynda Heinicke.

William J. Haynes, III, Nashville, Tennessee, for the appellee, Patricia Battle.

**OPINION**

**I.**

The Tennessee Department of Mental Health operates five regional mental health institutes in Tennessee. The Middle Tennessee Mental Health Institute ("MTMHI") is a facility in Nashville with the capacity to serve 245 patients. All of MTMHI's patients are involuntarily admitted, which means they have been found to "pose[ ] an immediate substantial likelihood of serious harm . . . because of . . . mental illness or serious emotional disturbance,"[1] and they have been placed at MTMHI because "all available less drastic alternatives to placement in a hospital or treatment resource are unsuitable to meet the needs of the person."[2]

Providing appropriate medication is an essential part of the treatment regimen for MTMHI's patients. Accordingly, during the time periods relevant to this litigation, MTMHI employed three full-time pharmacists and one part-time pharmacist. These pharmacists were responsible for all medications dispensed at the facility. Their duties included (1) preparing each patient's medications one week in advance, (2) placing these medications in a medication cart, and (3) preparing additional medications whenever they were ordered. The fully stocked medication carts were placed in a locked medication room in each individual unit, and only the medication nurse on duty in each unit had access to the medication room and the medication cart.

Because of budget and staffing constraints in the 1970s, MTMHI changed its policy for dispensing medications by adopting a "night locker" policy.[3] Under this night locker policy, the pharmacists no longer worked on the night and weekend shifts. They continued to prepare and dispense all required medications during their respective shifts, but they were

---

[1]*See* Tenn. Code Ann. §§ 33-6-401 and 33-6-501 (2007).

[2]*See* Tenn. Code Ann. §§ 33-6-403(4) and 33-6-502(4) (2007).

[3]The policy was initially referred to as the "Mini-Pharmacy" policy but was later referred to as the "night locker" policy. In this opinion, we will refer to the policy as the "night locker" policy.

no longer physically present at the facility at night or on the weekend. However, the policy required a pharmacist to be on call at all times.

In order to address unplanned after-hours needs caused by an emergency or by the admission of a new patient, the pharmacists also prepared doses of particular medications, not specific to any individual patient, and placed these medications in a "night locker" adjacent to the pharmacy. The nursing supervisor on duty for the Acute Treatment Program was originally responsible for managing the night locker for the entire facility. However, in August 2003, the responsibility for the night locker was transferred to the nursing supervisor on duty for the Extended Treatment Program because the Acute Treatment Program had more after-hours admissions than the Extended Treatment Program.[4]

Under the night locker policy, a nurse desiring medication was required to present a physician's order sheet and a drug requisition form containing the required patient information to the appropriate nursing supervisor. Based on these orders, the nursing supervisor obtained the needed medication from the night locker and provided the medication to the requesting nurse. After the nurse received the requested medication, the nurse would administer the medication to the patient.

The nurses working in the Extended Treatment Program, including Patricia Battle and Dorothy King, were concerned about the changes to the night locker policy. They were uncomfortable about their lack of familiarity with the medications needed in MTMHI's other program areas, their ability to contact a pharmacist after hours, the security of the night locker key, and their sense of being overwhelmed by shouldering this new responsibility. In response to the nurses' concerns, MTMHI (1) scheduled in-service training with the head pharmacist, (2) purchased a drug database system for the nurses' use, (3) extended the pharmacists' shifts to increase the amount of time that a pharmacist would be on the premises, (4) required the on-call pharmacist to carry a cellular phone rather than a pager, and (5) scheduled additional meetings to enable the nurses to ask questions and to express concerns. MTMHI also revamped the security policies regarding access to the night locker and instituted a nightly count of the narcotic drugs.

At the outset, a number of nurses expressed concerns that the new tasks they were being asked to perform exceeded the scope of a nurse's duty and, therefore, that they would place their nursing license at risk if they performed these tasks. To allay the nurses' fears, MTMHI asked both the Board of Nursing and the Board of Pharmacy to review its night locker policy, and both Boards found that the policy was proper. In addition, MTMHI asked Elizabeth Lund, the Executive Director of the Board of Nursing, to meet with the concerned

---

[4]In late July 2003, the head pharmacist provided in-service training to the nurses in the Extended Treatment Program regarding the use of the night locker.

nurses. At a meeting on October 2, 2003, Ms. Lund stated that MTMHI's night locker policy did not require nurses to engage in conduct that exceeded the scope of their licenses. In response to a question regarding the consequences of a nurse's refusal to comply with the night locker policy, the nurses were told that "employers have the ability to make assignments and that people who choose not to comply with assignments have to suffer the consequences."

The meeting with Ms. Lund appeared to satisfy the concerns of all the nurses except for Ms. Battle and Ms. King. On October 8, 2003, Ms. Battle filed a formal grievance regarding the policy. Virginia Betts, then the Commissioner of the Department of Mental Health and Developmental Disabilities,[5] responded by letter that the policy was not a grievable matter.[6] Commissioner Betts relied on Ms. Lund's opinion that the policy was not contrary to acceptable nursing practice and pointed out that the policy was consistent with policies adopted in other hospitals in Tennessee. She also informed Ms. Battle that she had the right to appeal the denial of her grievance to the Civil Service Commission.

Rather than appealing to the Civil Service Commission, Ms. Battle filed a petition for a declaratory order with the Board of Nursing. Ms. Battle pointed out that the regulations prohibited nurses from "issu[ing]" drugs without defining the term and requested that the Board define the term. Following a hearing before the Board on October 22, 2004, Lynn McDonald, MTMHI's chief executive officer, assured Ms. Battle that there would be no retaliation for her efforts to clarify the Board of Nursing's position regarding MTMHI's night locker policy. On October 28, 2004, the Board entered an order (1) equating the term "issues drugs" with the definition of the term "dispense" used in the Tennessee Pharmacy Practice Act of 1996[7] and (2) finding that "the Petitioners have not violated the provisions of Chapter 1000-4-.04(1), and their licenses will not be subjected to disciplinary action within this context."

Despite the official assurances from the Board of Nursing that adhering to the night locker policy would not place her nursing license in jeopardy, Ms. Battle continued to object

---

[5]Commissioner Betts is no longer the head of the Department of Mental Health. While Tenn. R. App. P. 19(c) envisions that former government officials will be automatically replaced as parties by their successors, this rule applies only to government officials sued in their official capacity. In this case, Commissioner Betts has been sued in her individual capacity, and, therefore, Tenn. R. App. P. 19(c) does not apply.

[6]Normally, Dr. Lindsey Douglas, the Grievance Review Officer for MTMHI, would first review a grievance and make recommendations to Commissioner Betts. In this instance, Commissioner Betts informed Dr. Douglas that the night locker policy could not be grieved and instructed Dr. Douglas to refer all grievances on that matter directly to her.

[7]*See* Tenn. Code Ann. § 63-10-204(12) (2010).

to the policy, not only within MTMHI but also in the Nashville media. Internally, Ms. Battle and Ms. King sent between eighty and one hundred memoranda to their superiors, mostly regarding perceived problems with the night locker policy. Ms. Battle also gave an interview to a local television reporter in direct contravention of MTMHI's policy.[8]

On August 10, 2005, Ms. Battle and Ms. King sued both the Department of Health and the Department of Mental Health and Developmental Disabilities in the Chancery Court for Davidson County seeking a declaratory judgment that the Department of Health had exceeded its authority by entering into the October 28, 2004 agreed order with the Board of Nursing. Ms. Battle and Ms. King voluntarily dismissed this complaint on November 29, 2005.

In early 2006, Ms. Battle and Ms. King met with Representative Nathan Vaughn to complain about MTMHI's night locker policy. At this meeting, the nurses discussed with Representative Vaughn their discomfort with the additional responsibilities of the night locker, their concern that they might lose their jobs for failing to comply with the policy, and their opinion regarding the potential dangers to patients should MTMHI continue to follow the policy. After the meeting, Representative Vaughn contacted Commissioner Betts and toured MTMHI. He eventually introduced legislation in the General Assembly to clarify the scope of a nurse's responsibilities regarding the administration of drugs. However, after the Board of Nursing, the Board of Pharmacy, and the Joint Commission on Accreditation of Healthcare Organizations told him that MTMHI's night locker policy was safe and did not violate the law, Representative Vaughn abandoned his efforts to pass his bill.

On April 17, 2006, after their efforts to force MTMHI to abandon its night locker policy failed, Ms. Battle and Ms. King filed suit in the Chancery Court for Davidson County against the Tennessee Department of Health and the Tennessee Department of Mental Health and Developmental Disabilities seeking a declaratory judgment and damages under 42 U.S.C. § 1983. Both departments moved to dismiss the complaint based on governmental immunity and because they were not "persons" for the purpose of 42 U.S.C. § 1983. In response to this motion, Ms. Battle and Ms. King amended their complaint seeking monetary damages under 42 U.S.C. § 1983 from Commissioner Betts, Ms. McDonald, Ms. Heinicke, and Dr. Douglas ("MTMHI defendants") in their official capacities. They later amended their complaint to sue these defendants in their individual capacities. The amended complaint alleged (1) that the MTMHI defendants were requiring them to perform tasks outside the scope of their professional capacity as registered nurses, (2) that they had been retaliated against for their

---

[8]This interview prompted Glynda Heinicke, Ms. Battle's immediate supervisor, to include negative comments on Ms. Battle's annual evaluation. After Ms. Battle filed a grievance regarding the evaluation, MTMHI changed her rating from "superior" to "exceptional." Ms. Heinicke later stated that at the time she filled out Ms. Battle's evaluation, she was unaware of Ms. McDonald's assurance to Ms. Battle that there would be no retaliation for her seeking a declaratory order from the Board of Nursing.

"vocal opposition" to the night locker policy, and (3) that they had been penalized for "exercising their constitutional right to free speech guaranteed by the First Amendment."

On January 11, 2008, almost two years after the lawsuit was filed, the MTMHI defendants filed a motion for summary judgment on the ground that Ms. Battle and Ms. King could not show "retaliation against [c]onstitutionally protected speech." On May 12, 2008, the MTMHI defendants also filed a motion for a judgment on the pleadings based on qualified immunity, a defense they had asserted in their original and amended answers. Ms. Battle and Ms. King opposed the summary judgment and moved to strike the motion for judgment on the pleadings on the ground that it was untimely filed.

The trial court granted the MTMHI defendants' motions from the bench at a hearing on July 15, 2008. The court concluded that "assuming that [the plaintiffs'] speech is protected, the court finds that the facts in this case show that the government had an adequate justification for its conduct in this case." The court also determined that the defendants were entitled to qualified immunity because, even assuming the speech was protected, "the right that was allegedly violated is not a clearly established right of which a reasonable person would have known." After the trial court denied their Tenn. R. Civ. P. 59.04 motion to alter or amend the judgment, Ms. Battle and Ms. King appealed to the Court of Appeals.[9]

The Court of Appeals filed its opinion on December 18, 2009. The court reversed the summary judgment for the MTMHI defendants after concluding that "material issues of fact regarding the issue of adverse employment action, mak[es] summary judgment inappropriate at this time," *King v. Betts*, 2009 WL 4893590, at *5, and because of the existence of "two starkly different contexts in which to determine whether [Ms.] Battle had a clearly protected constitutional right to speak out against the 'mini-pharmacy' policy."[10] *King v. Betts*, 2009 WL 4893590, at *7. The Court of Appeals also reversed the trial court's grant of judgment on the pleadings after finding that Ms. Battle had stated a viable claim. *King v. Betts*, 2009 WL 4893590, at *7.

The MTMHI defendants filed a Tenn. R. App. P. 11 application for permission to appeal. They asserted that the Court of Appeals erred by reversing the trial court's conclusion that they were entitled to qualified immunity and that the Court of Appeals had erred by reversing the summary judgment on Ms. Battle's First Amendment retaliation claim. We granted the MTMHI defendants' application for permission to appeal to address the

---

[9]The Court of Appeals dismissed Ms. King's appeal on September 11, 2009. *See King v. Betts*, 2009 WL 4893590, at *1 n.1. Accordingly, we will limit our opinion to the issues raised by Ms. Battle.

[10]The two different contexts within which to view Ms. Battle's actions are as a disgruntled employee speaking out against a policy of her employer or as a private citizen speaking on a matter of public concern. *See Garcetti v. Ceballos*, 547 U.S. 410, 418-20 (2006).

procedure for the consideration of qualified immunity defenses in 42 U.S.C. § 1983 actions and to determine whether the MTMHI defendants were entitled to qualified immunity on the facts of this case.

## II.

The Fourteenth Amendment establishes binding standards of conduct for state and local government officials and employees, but it does not prescribe remedies when these standards of conduct are breached. 1 Martin A. Schwartz, *Section 1983 Litigation: Claims and Defenses* § 1.05[D], at 1-21 (4th ed. Supp. 2011) ("Schwartz"). The choice of remedies is a "matter of policy" that generally "requires the exercise of legislative judgment." 1 Laurence H. Tribe, *American Constitutional Law* § 4-14, at 763 (3d ed. 2000). Accordingly, in 1871, Congress, exercising its power under Section 5 of the Fourteenth Amendment, provided these remedies when it enacted 42 U.S.C. § 1983.[11]

Section 1983 does not create or confer substantive rights. *Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 617 (1979) ("[O]ne cannot go into court and claim a 'violation of § 1983'– for § 1983 by itself does not protect anyone against anything.").[12] It provides a remedy for violations of rights protected by the United States Constitution or by a federal statute other than Section 1983 itself. *Albright v. Oliver*, 510 U.S. 266, 271 (1994); *Graham v. Connor*, 490 U.S. 386, 393-94 (1989); *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979).[13] Thus, plaintiffs filing suit under Section 1983 "must point to another source, either the United States Constitution or federal statutes, for the substantive rights they seek to enforce." 1 Bodensteiner & Levinson § 1:1, at 1-5.

The primary focus of Section 1983 is "to deter state actors[14] from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." *Wyatt v. Cole*, 504 U.S. 158, 161 (1992) (footnote

---

[11]*See* 1 Ivan E. Bodensteiner & Rosalie Berger Levinson, *State and Local Government Civil Rights Liability* § 1:1, at 1-4 (2010) ("Bodensteiner & Levinson"); 1 Sheldon H. Nahmod, *Civil Rights & Civil Liberties Litigation: The Law of Section 1983* § 1:3, at 1-6 (4th ed. 2010) ("Nahmod"); *see generally Monroe v. Pape*, 365 U.S. 167, 171 (1961), *overruled in part on other grounds by Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978).

[12]*See also* 1 Steven H. Steinglass, *Section 1983 Litigation in State Courts* § 1:1 (2010).

[13]*See also* 4 Ronald D. Rotunda & John E. Nowak, *Treatise on Constitutional Law: Substance and Procedure* § 19.19, at 539 (4th ed. 2008) ("Rotunda & Nowak").

[14]*See Mitchum v. Foster*, 407 U.S. 225, 240 (1972) (quoting *Ex Parte Virginia*, 100 U.S. 339, 346 (1879)) ("[T]he Act was intended to enforce the provisions of the Fourteenth Amendment 'against State action, . . . whether that action be executive, legislative, or judicial.'").

added). The statute has become the principal civil remedy for the enforcement of federal constitutional and statutory rights.[15] *Cf.* 4 Rotunda & Nowak, § 19:13, at 509. Thus, Section 1983 has been invoked "in virtually every conceivable setting to enforce every conceivable right in the Constitution." 2 Rodney A. Smolla, *Federal Civil Rights Acts* § 14:104 (3d ed. 2011) ("Smolla").

In broad terms, a claim under Section 1983 has two essential elements. The first element, in the words of the statute itself, is that the challenged conduct must have been committed by a "person [acting] under color of any statute, ordinance, regulation, custom, or usage, of any State." 42 U.S.C. § 1983. The second element is that this conduct must deprive the plaintiff of "rights, privileges, or immunities secured by the Constitution and laws [of the United States]."[16] 42 U.S.C. § 1983. While Section 1983 complaints need not comply with heightened pleading standards,[17] persons seeking to recover damages under Section 1983 must allege and prove more than a violation of federal law. They must allege and prove that they personally[18] suffered an actual injury[19] to a federally protected right. *See Blessing v. Freestone*, 520 U.S. 329, 340-41 (1997).

## III.

Section 1983 does not contain explicit immunity provisions. However, the United States Supreme Court has held repeatedly that Congress did not intend to abrogate the immunities from suit that the common law accorded public officials and employees when

---

[15]Section 1983 does not displace, but rather supplements, the remedies that may be available under state law. *McNeese v. Bd. of Educ. for Cmty. Unit Sch. Dist. 187*, 373 U.S. 668, 672 (1963); *Collard v. Kentucky Bd. of Nursing*, 896 F.2d 179, 184 (6th Cir. 1990).

[16]*See* 4 Rotunda & Nowak § 19.16(a), at 520. Some academics have also observed that these two elements contain the following four separate requirements: "(1) a violation of rights protected by the federal Constitution or created by federal statute or regulation, (2) proximately caused, (3) by the conduct of a 'person' (4) who acted 'under color of any statute, ordinance, regulation, custom or usage, of any State or Territory or the District of Columbia.'" *See, e.g.*, 1 Schwartz § 1.04[A], at 1-17 to 1-18 (footnotes omitted).

[17]*See Crawford-El v. Britton*, 523 U.S. 574, 590-95 (1998); *Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164-69 (1993); *Goad v. Mitchell*, 297 F.3d 497, 502-03 (6th Cir. 2002); *see also* 1 Nahmod § 1:43.

[18]*See* 1 Schwartz § 1.04[B], at 1-19 ("It is well established that the federally protected rights that are enforceable under § 1983 are 'personal' to the injured party.").

[19]*Farrar v. Hobby*, 506 U.S. 103, 112 (1992) (holding that "no compensatory damages may be awarded in a § 1983 suit absent proof of actual injury"); *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 310 (1986) (holding that "Section 1983 presupposes that damages that compensate for actual harm ordinarily suffice to deter constitutional violations"); *see also* 1 Nahmod §§ 4:1, 4:29; 2 Smolla § 14:154.

Section 1983 was enacted. *See, e.g.*, *Buckley v. Fitzsimmons*, 509 U.S. 259, 268 (1993); *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 66 (1989); *see also* 2 Smolla §§ 14:27-14:28. Accordingly, the United States Supreme Court has recognized two kinds of immunity in civil actions for damages under Section 1983 – absolute immunity[20] and qualified immunity. *See* 2 Nahmod §§ 7:1, 8:1. These immunities can make recovery under Section 1983 a "formidable task." 2 Smolla § 14:7.

Because "[m]ost public officials are entitled only to 'qualified immunity,'" 2 Smolla § 14:30, claims of qualified immunity have become the "workhorse defense" in most Section 1983 cases. 2 Smolla § 14:50. "The scope of qualified immunity includes most state and local officials and employees at all levels of responsibility . . . 'with the exception of those [officials] who have absolute immunity.'" 4 Rotunda & Nowak § 19.28(a), at 575 (quoting Sheldon H. Nahmod, *Civil Rights & Civil Liberties Litigation: A Guide to § 1983*, at § 8.14, at 261 (1979)).

The central purpose of affording qualified immunity to government officials and employees "is to protect them 'from undue interference with their duties and from potentially disabling threats of liability.'" *Elder v. Holloway*, 510 U.S. 510, 514 (1994) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800 at 806). More recently, the United States Supreme Court has also noted that qualified immunity "protect[s] the State and its officials from overenforcement of federal rights." *Johnson v. Fankell*, 520 U.S. 911, 919 (1997).[21] Accordingly, Professor Nahmod has pointed out that qualified immunity strikes a balance between the desire to prevent, and to provide compensation for, violations of the United States Constitution and federal law and the interest in avoiding undue interference with independent decision-making by government officials. 2 Nahmod § 8:1, at 8-5.

---

[20]Absolute immunity is afforded to government officials who perform "special functions" similar to those that would have been immune when Congress enacted Section 1983. *Butz v. Economou*, 438 U.S. 478, 508 (1978). "A far narrower range of officials" are entitled to absolute immunity, 2 Smolla § 14:31, and thus the United States Supreme Court has been "quite sparing in its recognition of claims to absolute official immunity." *Forrester v. White*, 484 U.S. 219, 224 (1988). The Supreme Court employs a "functional approach" to determine whether a government official is entitled to absolute immunity. *Burns v. Reed*, 500 U.S. 478, 486 (1991); *Harlow v. Fitzgerald*, 457 U.S. 800, 810 (1982); *see also* 2 Nahmod § 7:2; 2 Smolla § 14:33.

[21]The Supreme Court has observed:

[I]t cannot be disputed seriously that claims frequently run against the innocent as well as the guilty – at a cost not only to the defendant officials, but to society as a whole. These social costs include the expenses of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from acceptance of public office.

*Harlow v. Fitzgerald*, 457 U.S. at 814 (footnote omitted).

Qualified immunity is more than simply a defense to liability. Its purpose is "to immunize a public official from the harassment, expense, and distraction caused by the lawsuit itself." 2 Smolla § 14:51; *see also Siegert v. Gilley*, 500 U.S. 226, 232-33 (1991) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)); *see also* 4 Rotunda & Nowak § 19:29(a), at 585-86. Qualified immunity entitles a defendant not to stand trial. *Saucier v. Katz*, 533 U.S. 194, 200 (2001). Thus, the purposes of qualified immunity are effectively undermined if a claim against a government official or employee is erroneously permitted to go to trial. *Mitchell v. Forsyth*, 472 U.S. at 526; *see also* 2 Smolla § 14:52. For the same reasons, decisions regarding the availability of qualified immunity should be made at the earliest opportunity in the proceeding in order to avoid the cost and expense of trial. *Osborn v. Haley*, 549 U.S. 225, 253 (2007); *Hunter v. Bryant*, 502 U.S. 224, 227 (1991); *Anderson v. Creighton*, 483 U.S. 635, 646 n.6 (1987); 4 Rotunda and Nowak § 19.29(a), at 585.

In 1982, the United States Supreme Court fashioned a new objective, two-part test for determining whether a government official or employee was entitled to qualified immunity in a civil action for damages under Section 1983.[22] This test focuses on the "objective reasonableness" of the official's behavior. *Harlow v. Fitzgerald*, 457 U.S. at 818. The Court held "that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. at 818.

No circumstance is more relevant to the availability of qualified immunity than whether the asserted right is clearly established. *Cf. Davis v. Scherer*, 468 U.S. 183, 192 (1984). Following the *Harlow v. Fitzgerald* decision, officials can be subject to suit only for "violations of clearly settled law which [the public official], in the absence of extraordinary circumstances, has a duty to know." 2 Nahmod § 8:1, at 8-6. "When it becomes apparent that the claim of illegal action by the public official involves a proposition of law that was unsettled at the time the official acted, the suit will be dismissed on qualified immunity grounds." 2 Smolla § 14:55. Conversely, a plaintiff seeking damages for violation of federal constitutional or statutory rights may overcome a public official's claim of qualified immunity by showing that his or her rights were clearly settled when the official acted. *Elder v. Holloway*, 510 U.S. at 515; *Davis v. Sherer*, 468 U.S. at 197.

Public officials are not expected to "anticipate subsequent legal developments." *Harlow v. Fitzgerald*, 457 U.S. at 818; *see also* 4 Rotunda & Nowak § 19.29(a), at 586.

---

[22]The former test in *Wood v. Strickland*, 420 U.S. 308 (1975) contained both subjective and objective elements. 4 Rotunda & Nowak § 19.29(a), at 583. The United States Supreme Court rejected this test because it made it more difficult for the courts to weed out insubstantial claims. *See Harlow v. Fitzgerald*, 457 U.S. at 815-19.

Accordingly, the requirement that the asserted federal right must be clearly established when the public official acted "operates 'to ensure that before they are subjected to suit, officers are on notice [that] their conduct is unlawful.'" *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quoting *Saucier v. Katz*, 533 U.S. at 206).

When determining whether an asserted right was clearly established, courts typically consider:

> (1) whether the right in question was defined with "reasonable specificity;" (2) whether the decisional law of the [United States] Supreme Court and the applicable circuit court support[s] the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

*Bradway v. Gonzales*, 26 F.3d 313, 318 (2d Cir. 1994) (quoting *Jermosen v. Smith*, 945 F.2d 547, 550 (2d Cir. 1991)); 2 Smolla § 14:55. Using the *Harlow v. Fitzgerald* test, the court must first examine the currently applicable law to determine whether the law was clearly established at the time the action in question occurred. *See Mitchell v. Forsyth*, 472 U.S. at 530; *Harlow v. Fitzgerald*, 457 U.S. at 818; *see also* 2 Smolla § 14:52. The analysis ends if the court finds that the federal law was not clearly established when the official acted. 4 Rotunda & Nowak § 19.29(a), at 586-87. If, however, the court determines that the asserted right was clearly established, the public official will be entitled to qualified immunity only by showing that, because of extraordinary circumstances, he or she did not know, nor reasonably should have known, that the right existed.[23] *Harlow v. Fitzgerald*, 457 U.S. at 819; *see also* Rotunda & Nowak § 19.29(a), at 585.

In decisions handed down after *Harlow v. Fitzgerald*, the United States Supreme Court has placed an even finer edge on the qualified immunity analysis. In *Anderson v. Creighton*, the Court adopted a very fact-specific approach for determining whether a right was clearly established that focused on the particular conduct of the official. *See* 2 Nahmod §§ 8:1, 8:11; 4 Rotunda & Nowak § 19.29(a), at 587. The Court also cautioned the lower

---

[23]Although the United States Supreme Court has set forth an additional method by which defendant public officials may still prevail with a qualified immunity defense, the Court has never defined "extraordinary circumstances," *see* 2 Bodensteiner & Levinson § 1A:6, at 1A-112, and the concept has not seen much litigation in the federal courts. *See generally Maestas v. Lujan*, 351 F.3d 1001, 1020 (10th Cir. 2003) (Briscoe, J., concurring) (finding that a reasonable but mistaken belief as to the facts surrounding an employment decision warranted application of the "extraordinary circumstances" prong of the qualified immunity analysis); *Burk v. Beene*, 948 F.2d 489, 494 (8th Cir. 1991) (suggesting that when the violation of the law is "unknown and unknowable" in the defendant official's circumstances, the official may enjoy qualified immunity despite a violation of an otherwise clearly established law).

courts not to assume that the plaintiff had alleged a constitutional violation in order to reach the issue of whether the law was clearly established. *Siegert v. Gilley*, 500 U.S. at 232.

In 2001, the Court stated that the required approach to resolving claims of qualified immunity was to determine first whether the facts alleged by the plaintiff were sufficient to make out a violation of a constitutional right. *Saucier v. Katz*, 533 U.S. at 201. If the plaintiff cleared this hurdle, the courts were then required to decide whether the right at issue was clearly established. *Saucier v. Katz*, 533 U.S. at 201.

In 2009, the Court abandoned the inflexible two-step in *Saucier v. Katz* in favor of a more flexible approach. 2 Smolla § 14:57. The new approach permitted lower courts to decide which of the two prongs of the qualified immunity analysis should be addressed first in any particular case. *Pearson v. Callahan*, 555 U.S. 223, 242 (2009). However, the Court also noted that while the

> *Saucier* protocol should not be regarded as mandatory in all cases, we continue to recognize that it is often beneficial . . . [because] there are cases in which there would be little if any conservation of judicial resources to be had by beginning and ending with a discussion of the 'clearly established' prong.

*Pearson v. Callahan*, 555 U.S. at 236.

The question of whether clearly settled law existed when the challenged conduct occurred is a question to be decided by the court rather than by a jury. *Hunter v. Bryant*, 502 U.S. at 228; *Harlow v. Fitzgerald*, 457 U.S. at 818; *see also Elder v. Holloway*, 510 U.S. at 516; 4 Rotunda & Nowak § 19.29(a), at 586-87. Whether the issue is characterized as a question of law or as a mixed question of law and fact,[24] the courts must make the ultimate decision regarding whether a public official is entitled to qualified immunity. 2 Nahmod § 8:24.

## IV.

State courts have concurrent jurisdiction with federal courts to adjudicate Section 1983 claims. *See Haywood v. Drown*, 556 U.S. ___, ___ 129 S. Ct. 2108, 2114 (2009); *Howlett ex rel. Howlett v. Rose*, 496 U.S. 356, 367 (1990); *Felder v. Casey*, 487 U.S. 131, 139 (1988); *see also* 1 Nahmod § 1:56; 4 Rotunda & Nowak § 19.15(c); 2 Smolla § 14:140.

---

[24] *See* 2 Nahmod § 8:24, at 8-118 (stating "whether the defendant reasonably could have believed that his [or her] conduct was lawful in light of clearly settled law and the information available to him [or her] – can be characterized as a mixed question of law and fact involving the application of law to facts").

Accordingly, Section 1983 claims may be filed in state court. *Maine v. Thiboutot*, 448 U.S. 1, 10-11 (1980) (citing *Martinez v. California*, 444 U.S. 277 (1980)); *Wimley v. Rudolph*, 931 S.W.2d 513, 515 (Tenn. 1996); *Poling v. Goins*, 713 S.W.2d 305, 306 (Tenn. 1986) (overruling *Chamberlain v. Brown*, 223 Tenn. 25, 442 S.W.2d 248 (1969)).

Under the Supremacy Clause of the United States Constitution, the federal substantive law of Section 1983 controls whenever a Section 1983 action is filed, whether in federal or state court. 1 Nahmod § 1:57, at 1-137. While Tennessee courts have not directly addressed the applicability of federal substantive law in Section 1983 cases, they have addressed the question in the context of cases filed in state court alleging Federal Employer's Liability Act ("FELA") claims. The principles recognized and applied in these cases guide our consideration of this case.

In FELA cases, the courts have recognized that when Tennessee courts are faced with a federal claim, they must apply the federal substantive law in conjunction with the Tennessee rules of procedure. *See Mills v. CSX Transp., Inc.*, 300 S.W.3d 627, 631 (Tenn. 2009); *Jennings v. Illinois Cent. R.R.*, 993 S.W.2d 66, 70 (Tenn. Ct. App. 1998); *Plunk v. Illinois Cent. R.R.*, No. 02A01-9707-CV-00167, 1998 WL 227772, at *3 (Tenn. Ct. App. May 8, 1998), *perm. app. denied* (Tenn. Oct. 19, 1998); *accord Duhon v. S. Pac. Transp. Co.*, 720 So. 2d 117, 120 (La. Ct. App. 1998).

A number of courts have recognized that the qualified immunity defense is a substantive right under federal law. *See Mitchell v. Forsyth*, 472 U.S. at 551 (Brennan, J., concurring and dissenting) (characterizing *Harlow v. Fitzgerald* as "modifying the substantive standards governing qualified immunity"); *Schultea v. Wood*, 47 F.3d 1427, 1433 (5th Cir. 1995) (en banc); *Veney v. Hogan*, 70 F.3d 917, 921 (6th Cir. 1995), *abrogated on other grounds by Goad v. Mitchell*, 297 F.3d 497, 505 (6th Cir. 2002); *Leo v. Trevino*, 285 S.W.3d 470, 480 (Tex. Ct. App. 2006). An important component of that right is that the burden is always on the plaintiff "to demonstrate the inapplicability of the defense." *McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002); *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001). Accordingly, when Tennessee courts are presented with a claim of qualified immunity in a civil action for damages filed under Section 1983, they should employ the Tennessee Rules of Civil Procedure to the extent they do not infringe upon the analysis set out in *Saucier v. Katz* and *Pearson v. Callahan* to determine whether the public official is entitled to qualified immunity.[25]

---

[25] A majority of our sister states and the District of Columbia have recognized that *Saucier v. Katz* and, by implication, *Pearson v. Callahan* provide the appropriate principles for analyzing a qualified immunity claim in a Section 1983 action filed in state court. *Ochser v. Funk*, 240 P.3d 1246, 1250 (Ariz. Ct. App. 2010); *Venegas v. Cnty. of Los Angeles*, 87 P.3d 1, 12-13 (Cal. 2004); *Fleming v. City of Bridgeport*, 935 A.2d 126, 139-41 (Conn. 2007); *Scales v. District of Columbia*, 973 A.2d 722, 726-28 (D.C. 2009);

(continued...)

# V.

Because qualified immunity is "an *immunity from suit* rather than a mere defense to liability," *Mitchell v. Forsyth*, 472 U.S. at 526, a public official is well-advised to assert qualified immunity "at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. at 227. Nevertheless, despite the practical benefits accompanying an early resolution of qualified immunity, the defense may be analyzed at virtually any stage of the proceeding.

Upon being served with a complaint including a Section 1983 claim, a prudent public official wishing to avoid the expense and distraction of litigation should immediately move to dismiss the complaint for failure to state a claim. *See, e.g.*, *Cottone v. Jenne*, 326 F.3d 1352, 1357 (11th Cir. 2003) (discussing a defendant's Fed. R. Civ. P. 12(b)(6) motion to dismiss for failure to state a claim based on qualified immunity); *see also* Tenn. R. Civ. P. 12.02(6) (failure to state a claim). The federal substantive right is, in the context of motions to dismiss for failure to state a claim, harmonious with both the federal and Tennessee's rules of procedure. *Compare* Fed. R. Civ. P. 12(b)(6), *and Harris v. Mills*, 572 F.3d 66, 71 (2d Cir. 2009) (tests legal sufficiency of the complaint), *with* Tenn. R. Civ. P. 12.02(6), and *Webb v. Nashville Area Habitat for Humanity*, ___ S.W.3d ___, ___, 2011 WL 2905584, at *2 (Tenn. 2011) (tests legal sufficiency of the complaint). In this context, the court must accept the allegations in the complaint as true and decide whether the plaintiff has alleged a constitutional violation that would infringe upon a clearly established right, as a matter of law. *See Cottone v. Jenne*, 326 F.3d at 1358; *cf. McClendon v. City of Columbia*, 305 F.3d

---

[25](...continued)

*Thompson v. Douds*, 852 So. 2d 299, 304 (Fla. Dist. Ct. App. 2003); *Kline v. KDB, Inc.*, 673 S.E.2d 516, 520-22 (Ga. Ct. App. 2009); *Rosenberger v. Kootenai Cnty. Sheriff's Dept.*, 103 P.3d 466, 469-70 (Idaho 2004); *Daniels v. State*, No. 07-1275, 2008 WL 4569870, at *3 (Iowa Ct. App. Oct. 15, 2008); *McCormick v. Bd. of Cnty. Comm'rs of Shawnee Cnty.*, 35 P.3d 815, 827-28 (Kan. 2001); *Richards v. Town of Eliot*, 2001 ME 132, ¶¶ 23-25, 780 A.2d 281, 290-91; *Newell v. Runnels*, 967 A.2d 729, 761-62 (Md. Ct. Spec. App. 2009); *Gutierrez v. Massachusetts Bay Transp. Auth.*, 772 N.E.2d 552, 560-61 (Mass. 2002); *Hojeije v. Dept. of Treasury*, 688 N.W.2d 512, 517-18 (Mich. Ct. App. 2004); *Mumm v. Mornson*, 708 N.W.2d 475, 483-84 (Minn. 2006); *Losleben v. Oppedahl*, 2004 MT 5, ¶ 14, 83 P.3d 1271, 1274; *Butler ex rel. Biller v. Bayer*, 168 P.3d 1055, 1061-62 (Nev. 2007); *Snelling v. City of Claremont*, 931 A.2d 1272, 1283 (N.H. 2007); *Bernstein v. State*, 986 A.2d 22, 35-36 (N.J. Super. Ct. App. Div. 2010); *Starko, Inc. v. Gallegos*, 2006 NMCA 85, ¶ 13, 140 P.3d 1085, 1091; *Alex LL. v Dept. of Soc. Servs. of Albany Cnty.*, 872 N.Y.S.2d 569, 575-76 (N.Y. App. Div. 2009); *Farrell ex rel. Farrell v. Transylvania Cnty. Bd. of Educ.*, 682 S.E.2d 224, 229 (N.C. Ct. App. 2009); *Swedlund v. Foster*, 2003 SD 8, ¶¶ 17-19, 657 N.W.2d 39, 47-48; *Eastland Ctny. Coop. Dispatch v. Poyner*, 64 S.W.3d 182, 195-96 (Tex. Ct. App. 2001); *Creech v. Eckerd Corp.*, No. L00-2414, 56 Va. Cir. 407, at *2-3 (Va. Cir. Ct. Sept. 18, 2001); *Petcu v. State*, 86 P.3d 1234, 1247-48 (Wash. Ct. App. 2004); *Thornton v. City of Milwaukee*, 2003 WI Ct. App. 188, ¶ 10, No. 02-2423, 2003 WL 21692648, at *2-3 (July 22, 2003); *Layland v. Stevens*, 2007 WY 188, ¶¶ 13-31, 171 P.3d 1070, 1073-77; *see also Sheldon v. City of Ambler*, 178 P.3d 459, 463-66 (Alaska 2008) (interpreting Alaskan statutory qualified immunity in light of *Saucier v. Katz*); *Rowan Cnty. v. Sloas*, 201 S.W.3d 469, 474-76 (Ky. 2006) (incorporating a subjective element of good faith into its state law immunity analysis).

at 323; *Doe v. Sundquist*, 2 S.W.3d 919, 922 (Tenn. 1999). If the plaintiff has failed to show on the facts alleged either a constitutional violation or that the right was clearly established, the trial court should grant the motion to dismiss.

The next opportunity for raising qualified immunity is in the defendant's answer.[26] *Cf. Harlow v. Fitzgerald*, 457 U.S. at 815. The trial court is not required to address qualified immunity when the defendant includes the defense in his or her answer but does not also file a motion to dispose of the case on that ground.

Once the pleadings are complete, the usual practice is for the public official to move for judgment on the pleadings in an effort to avoid the costs of discovery. *See* Tenn. R. Civ. P. 12.03; *see generally Cottrell v. Caldwell*, 85 F.3d 1480, 1487 (11th Cir. 1996) (referencing Fed. R. Civ. P. 12(c)). The plaintiff would then have an opportunity to clarify his or her position in its response to the defendant's motion. *Cf.* Tenn. R. Civ. P. 12.04 (providing for a preliminary hearing to address motions for judgments on the pleadings).

Both federal substantive law and Tennessee procedural law are in harmony because a motion for judgment on the pleadings is "in effect a motion to dismiss for failure to state a claim upon which relief can be granted." *Timmins v. Lindsey*, 310 S.W.3d 834, 838 (Tenn. Ct. App. 2009); *Waldron v. Delffs*, 988 S.W.2d 182, 184 (Tenn. Ct. App. 1998) (citing 3 Nancy F. MacLean & Bradley A. MacLean, *Tennessee Practice* 190 (2d ed. 1989)). The trial court similarly would "accept as true 'all well-pleaded facts and all reasonable inferences drawn therefrom' alleged by the party opposing the motion" and decide whether the public official is entitled to qualified immunity as a matter of law. *Timmins v. Lindsey*, 310 S.W.3d at 838 (quoting *Cherokee Country Club, Inc. v. Knoxville*, 152 S.W.3d 466, 470 (Tenn. 2004)); *see also McClenahan v. Cooley*, 806 S.W.2d 767, 769 (Tenn. 1991).

---

[26]The United States Supreme Court has stated that qualified immunity must be pleaded in the answer. *Harlow v. Fitzgerald*, 457 U.S. at 815 (citing *Gomez v. Toledo*, 446 U.S. 635 (1980)). Under Tenn. R. Civ. P. 8.03, affirmative defenses must be raised in a responsive pleading, and the failure to raise an affirmative defense generally results in waiver. *See ADT Sec. Servs., Inc. v. Johnson*, 329 S.W.3d 769, 778-79 (Tenn. Ct. App. 2009). A number of federal courts have not applied the corresponding waiver rule in Fed. R. Civ. P. 8(c) when a public official has not asserted qualified immunity in his or her answer. *See Pasco ex rel. Pasco v. Knoblauch*, 566 F.3d 572, 577 (5th Cir. 2009) (holding that the defendant did not waive qualified immunity despite waiting until fifty-two (52) months after the complaint was filed to assert the defense); *Eddy v. Virgin Islands Water & Power Auth.*, 256 F.3d 204, 210 (3d Cir. 2001) ("We agree with the conclusions of the First and Sixth Circuits that the defense of qualified immunity is not necessarily waived by a defendant who fails to raise it until the summary judgment stage."); *Guzman-Rivera v. Rivera-Cruz*, 98 F.3d 664, 667-68 (1st Cir. 1996) (adopting the Sixth Circuit's discretionary approach); *English v. Dyke*, 23 F.3d 1086, 1090 (6th Cir. 1994) (granting trial courts discretion as to how strictly to apply the federal waiver rule when qualified immunity is not raised in the initial pleading). We need not address the issue of waiver in this case because the MTMHI defendants raised the qualified immunity defense in their answer.

If a public official's claim of qualified immunity has not been addressed either by a motion to dismiss, a motion for judgment on the pleadings, or other similar motion,[27] the public official may very well be subjected to the disruption and expense of the discovery process. While some courts have limited the scope of initial discovery to the circumstances relating to the qualified immunity claim, *see Schultea v. Wood*, 47 F.3d at 1434, we see no reason to limit the scope of discovery after a trial court has denied a public official's motion to dismiss, motion for judgment on the pleadings, or other similar motion.

Even after discovery has been commenced or completed, a public official may seek a summary judgment on the ground of qualified immunity. *See Payne v. Breuer*, 891 S.W.2d 200, 201 (Tenn. 1994). When a public official seeks a summary judgment on the ground of qualified immunity, the claim should be treated as an affirmative defense. Accordingly, when the public official alleges that the undisputed facts demonstrate that he or she is entitled to qualified immunity, the burden of production shifts to the plaintiff to demonstrate that the public official is not entitled to qualified immunity. *See Sherrill v. Souder*, 325 S.W.3d 584, 598 n.10 (Tenn. 2010); *Hannan v. Alltel Publ'g Co.*, 270 S.W.3d 1, 9 n.6 (Tenn. 2008). A public official establishes a prima facie claim of qualified immunity by demonstrating that he or she is a state official acting within his or her discretionary authority. *See Rich v. Dollar*, 841 F.2d 1558, 1563-64 (11th Cir. 1988). A plaintiff confronted with a summary judgment motion raising qualified immunity must demonstrate the inapplicability of the defense. *McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002). The plaintiff can defeat the motion either by demonstrating the existence of material factual disputes or by demonstrating that the defendant is not entitled to qualified immunity as a matter of law. *Dowdell v. Chapman*, 930 F. Supp. 533, 550-51 (M.D. Ala. 1996) (citing *Rich v. Dollar*, 841 F.2d 1558, 1563 (11th Cir. 1988)).[28]

---

[27]Some courts have addressed qualified immunity claims in the context of a motion in limine. *See, e.g.*, *Nelson v. Silverman*, 888 F. Supp. 1041, 1048-49 (S.D. Cal. 1995)*; Gutierrez v. Massachusetts Bay Transp. Auth.*, 772 N.E.2d 552, 561 (Mass. 2002). We do not believe that motions in limine provide an appropriate vehicle for considering qualified immunity claims. The right to qualified immunity is a "purely legal question," *Siegert v. Gilley*, 500 U.S. at 232, while a motion in limine, at least in Tennessee practice, is tantamount to "an evidentiary objection at trial." *Duran v. Hundai Motor Am., Inc.*, 271 S.W.3d 178, 192 (Tenn. Ct. App. 2008).

[28]Even when a plaintiff demonstrates that a public official's conduct violated a right that was clearly established at the time the conduct occurred, a public official may still be entitled to qualified immunity if he or she can demonstrate that, due to "extraordinary circumstances," he or she did not know or should not reasonably have known his or her conduct violated clearly established law. *Harlow v. Fitzgerald*, 457 U.S. at 819; *see also* 4 Rotunda & Nowak § 19.29(a), at 585. The Court has not defined "extraordinary circumstances," and it has been rarely invoked in federal courts. *See generally Maestas v. Lujan*, 351 F.3d 1001, 1020 (10th Cir. 2003) (Briscoe, J., concurring); *Burk v. Beene*, 948 F.2d 489, 494 (8th Cir. 1991); *see also* 2 Bodensteiner & Levinson § 1A:6, at 1A-112.

A public official whose qualified immunity claim has not prevailed prior to trial may generally continue to assert qualified immunity at trial. *See English v. Dyke*, 23 F.3d at 1089 (citing *Kennedy v. City of Cleveland*, 797 F.2d 297, 300 (6th Cir. 1986)). Even at this stage, however, the question of qualified immunity remains a question of law for the court to resolve.

Qualified immunity questions will generally arise at trial in two ways. First, the public official may seek a directed verdict either at the close of the plaintiff's case or following the close of all the proof.[29] Should the public official move for a directed verdict, the trial court may grant the motion only if it finds that the evidence, viewed most favorably to the plaintiff, permits a reasonable person to reach only one conclusion and that this conclusion favors the public official. *See Johnson v. Tennessee Farmers Mut. Ins. Co.*, 205 S.W.3d 365, 370 (Tenn. 2006). Second, the trial court may use special interrogatories to request the jury to resolve any disputed fact questions relating to the qualified immunity defense.[30] However, once the jury resolves the factual disputes, the court must itself determine whether the public official is entitled to qualified immunity. Only after the trial court determines that the official is not entitled to qualified immunity should the jury be permitted to assess damages.

Regardless of how the issue is raised in the trial court, an appellate court reviewing a public official's assertion of qualified immunity must conduct a de novo review of the record, *see generally Sanderfer v. Nichols*, 62 F.3d 151, 153 (6th Cir. 1995), using the analysis set forth in *Saucier v. Katz* and *Pearson v. Callahan*. *See* 2 Smolla § 14:56. The standards and scope of review will depend on the procedural posture of the case when the final decision regarding qualified immunity is made.[31]

## VI.

Because our review depends upon the procedural posture of the case, we must look to what occurred in the trial court. For reasons not evident in this record, the MTMHI defendants waited almost two years after the lawsuit was filed to seek a judicial ruling on their qualified immunity claim. They first filed a motion for summary judgment and then,

---

[29]*See, e.g., White v. Walker*, 950 F.2d 972, 974 (5th Cir. 1991); *Alvarado v. Picur*, 859 F.2d 448, 451 n.3 (7th Cir. 1988); *Thorsted v. Kelly*, 858 F.2d 571, 575 (9th Cir. 1988).

[30]*See Littrell v. Franklin*, 388 F.3d 578, 585 (8th Cir. 2004); *Johnson v. Breeden*, 280 F.3d 1308, 1318 (11th Cir. 2002); *Cottrell v. Caldwell*, 85 F.3d 1480, 1488 (11th Cir. 1996); *see also* 1 Schwartz § 3.11[C][2], at 3-353 to -359.

[31]The United States Supreme Court has noted, for example, that "the legally relevant factors . . . will be different on summary judgment than on an earlier motion to dismiss." *Behrens v. Pelletier*, 516 U.S. 299, 309 (1996).

four months later, filed a motion for judgment on the pleadings. Full discovery was complete by the time these motions were filed.

The MTMHI defendants take the Court of Appeals to task for concluding that a summary judgment was inappropriate because of material factual disputes in the record beyond the pleadings themselves. This argument overlooks the admonition in Tenn. R. Civ. P. 12.03 that, when "matters outside the pleadings are presented to and not excluded by the trial court," a motion for judgment on the pleadings "shall be treated as one for summary judgment." Because the MTMHI defendants relied upon multiple discovery documents to support their motion for judgment on the pleadings, the Court of Appeals did not err by reviewing their motion using the standards applicable to summary judgments.

Summary judgments can be used in virtually any civil case that can be resolved on the basis of legal issues alone. *B & B Enters. of Wilson Cnty., LLC v. City of Lebanon*, 318 S.W.3d 839, 844 (Tenn. 2010). They were never intended to replace trials of disputed factual issues, and thus they should not be granted when the material facts are disputed or when more than one conclusion can be reasonably drawn from the facts. *CAO Holdings, Inc. v. Trost*, 333 S.W.3d 73, 82 (Tenn. 2010).

A lower court's decision regarding a summary judgment involves a question of law and is not entitled to a presumption of correctness when reviewed by a higher court. *See Cumulus Broad., Inc. v. Shim*, 226 S.W.3d 366, 373 (Tenn. 2007). Accordingly, reviewing courts must review the record de novo and make a fresh determination regarding whether a party filing a Tenn. R. Civ. P. 56 motion is entitled to a summary judgment. *Abshure v. Methodist Healthcare-Memphis Hosps.*, 325 S.W.3d 98, 103 (Tenn. 2010). When considering the evidence, the reviewing court must consider the evidence in a light most favorable to the non-moving party and must resolve all reasonable inferences in the non-moving party's favor. *B & B Enters. of Wilson Cnty., LLC v. City of Lebanon*, 318 S.W.3d at 845. The moving party is entitled to a summary judgment only when it demonstrates that there are no genuine issues of material fact and that it is entitled to a judgment as a matter of law. *Starr v. Hill*, ___ S.W.3d ___, ___, 2011 WL 3835405, at *2 (Tenn. 2011).

## VII.

Ms. Battle's Section 1983 claim, viewed in its most favorable light, is that the MTMHI defendants wrongfully retaliated against her after she exercised her right to speak out on a matter of public concern. In response, the MTMHI defendants assert that they are entitled to qualified immunity because the extent of Ms. Battle's constitutionally protected free speech rights was not clearly established at the time and because they did not take any adverse employment action against Ms. Battle for publicly criticizing the night locker policy. Accordingly, the dispositive questions with regard to the MTMHI defendants' qualified

-18-

immunity claim are: (1) Was Ms. Battle speaking about a matter of public concern when she criticized the night locker policy, (2) Was the scope of Ms. Battle's right to criticize the night locker policy clearly established at the time, and (3) Did the MTMHI defendants take any materially adverse employment actions against Ms. Battle as a result of her public criticism of the night locker policy?

The facts material to the answers to these questions are not in dispute.[32] All of the MTMHI defendants were state employees and officials during the events relevant to this case. No question has been raised regarding their discretionary authority to promulgate rules regarding the operation of the facility and to make decisions regarding the management of the staff employed at the facility. Because there was no disagreement that the MTMHI defendants were state employees and officials making discretionary decisions under color of state law, the burden shifted to Ms. Battle to demonstrate that the MTMHI defendants were not entitled to qualified immunity because her First Amendment right to publicly criticize the night locker policy was clearly established and that the MTMHI officials retaliated against her by subjecting her to materially adverse employment actions.

**A.**

We turn first to the question of whether Ms. Battle was engaging in constitutionally protected speech when she criticized the night locker policy. Although government employees do not relinquish their First Amendment rights when they accept government employment, the scope and extent of their rights is tempered by the employment relationship. *Waters v. Churchill*, 511 U.S. 661, 671 (1994) (stating that "the government as employer indeed has far broader powers than does the government as sovereign"); *Connick v. Myers*, 461 U.S. 138, 147 (1983); *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 568 (1968).

Whether the government, as an employer, has discretion to limit an employee's speech without violating the First Amendment turns on the nature of the employee's speech. As the United States Supreme Court has noted:

> *Pickering* and the cases decided in its wake identify two
> inquiries to guide interpretation of the constitutional protections

---

[32]The Court of Appeals erred by concluding that a jury should decide whether Ms. Battle's criticisms of the night locker policy involved a matter of public concern, whether Ms. Battle's right to criticize the night locker policy was clearly established, and whether the MTMHI defendants took any materially adverse employment action against Ms. Battle because she criticized the night locker policy. These are all matters for the court to decide based on the undisputed facts. We did not reach the issue of causation, which is a question for the jury when there are genuine issues of material fact. *See Sykes v. Chattanooga Housing Auth.*, 343 S.W.3d 18, 32 (Tenn. 2011).

accorded to public employee speech. The first requires determining whether the employee spoke as a citizen on a matter of public concern. If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech. If the answer is yes, then the possibility of a First Amendment claim arises. The question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public. This consideration reflects the importance of the relationship between the speaker's expressions and employment. A government entity has broader discretion to restrict speech when it acts in its role as employer, but the restrictions it imposes must be directed at speech that has some potential to affect the entity's operations.

*Garcetti v. Ceballos*, 547 U.S. at 418 (citations omitted).

To be considered protected speech, a government employee's statements must be related to a matter of public concern rather than a mere private grievance. 1 Schwartz § 3.11[C][1], at 3-346 to -347. Distinguishing between the two can be difficult. *Connick v. Myers*, 461 U.S. at 150. Nonetheless, despite the difficulty of the legal and factual issues, the question of whether an employee's speech involves a private employment grievance or a matter of public concern remains a question for the courts. *Bonnell v. Lorenzo*, 241 F.3d 800, 809-10 (6th Cir. 2001) (citing *Rankin v. McPherson*, 483 U.S. 378, 383, 386 n.9 (1987)); 1 Schwartz § 3.11[C][1], at 3-347.

The facts of this case illustrate the difficulty in distinguishing between speech involving matters of private concern and speech concerning matters of public interest. Both the trial court and the Court of Appeals were hesitant to characterize Ms. Battle's speech. Their hesitation is understandable because the tenor and nature of Ms. Battle's speech changed over time. At the outset, most of Ms. Battle's remarks involved her personal concerns about losing her nursing license and the stress caused by adding new responsibilities to her job. However, as time went on, the focus of Ms. Battle's complaints changed. By the time she met with Representative Vaughn and gave an unauthorized interview to a television reporter, Ms. Battle's criticisms of the night locker policy included concerns that the policy compromised patient safety.

In "mixed speech" cases where the speech at issue touches on both public and private matters, the courts must balance the "content, form, and context of a given statement, as revealed by the whole record" to determine whether the speech is predominately on a matter of public concern. *Connick v. Myers*, 461 U.S. at 147-48; *see also Teague v. City of Flower*

*Mound,* 179 F.3d 377, 380-83 (5th Cir. 1999); *Rahn v. Drake Ctr., Inc.*, 31 F.3d 407, 412 (6th Cir. 1994); *Phillips v. State Bd. of Regents*, 863 S.W.2d 45, 51 (Tenn. 1993); 1 Bodensteiner & Levinson § 1:10, at 1-288 to -289. Speech involves a matter of public concern when its content can "be fairly considered as relating to any matter of political, social, or other concern to the community." *See Connick v. Myers*, 461 U.S. at 146. To be protected, the content of the speech must "'*sufficiently inform the issue* as to be helpful to the public in evaluating the conduct of the government.'" *Witham v. Baptist Health Care of Okla., Inc.*, 98 F.3d 581, 583 (10th Cir. 1996) (quoting *Wilson v. City of Littleton*, 732 F.2d 765, 768 (10th Cir. 1984)). We note that "[s]peech on matters directly affecting the health and safety of the public is obviously a matter of public concern." *Chappel v. Montgomery Cnty. Fire Prot. Dist. No. 1*, 131 F.3d 564, 578 (6th Cir. 1997); *see also Gustafon v. Jones*, 117 F.3d 1015, 1021 (7th Cir. 1997).

The characterization of Ms. Battle's speech is a close call. Her complaints initially reflected her concern that the night locker policy might jeopardize her nursing license, might subject her to malpractice liability, and would cause her job-related stress. These sorts of internal office matters are unlikely to rise to the level of a matter of public concern. *See* 1 Bodensteiner & Levinson § 1:10, at 1-314 to -318. However, in addition to these concerns, Ms. Battle eventually began to publicly criticize the night locker policy as endangering patient safety. Her public criticisms of the policy to Representative Vaughn and to the television reporter focused more on the safety of the patients at MTMHI rather than on her more personal issues.

After considering the "content, form, and context" of Ms. Battle's statements as a whole, it is at least arguable that Ms. Battle's comments were motivated by her personal desires. However, "the First Amendment is concerned not only with a speaker's interest in speaking, but also with the public's interest in receiving information." *Chappel v. Montgomery Cnty. Fire Prot. Dist. No. 1*, 131 F.3d at 574. Therefore, we find that the public would take an active interest in being informed about MTMHI's night locker policy and its potential dangers to the patients at MTMHI. Accordingly, we have concluded that, for the purpose of her Section 1983 claim, Ms. Battle's speech involved matters of public concern.

**B.**

Concluding that Ms. Battle's public statements regarding MTMHI's night locker policy involves matters of public concern is only the first step of the analysis. It establishes only that Ms. Battle has a potential Section 1983 claim for interference with her First Amendment rights. The MTMHI defendants are entitled to qualified immunity unless Ms. Battle can also demonstrate that her right to publicly criticize the night locker policy was clearly established when the MTMHI defendants engaged in the conduct that gave rise to her claim. The undisputed facts in this record do not support the conclusion that, at the times

relevant to Ms. Battle's claim, her right to publicly challenge and criticize the night locker policy was clearly established.

In the most general terms, it has been clearly established that government employees are constitutionally protected from retaliation for publicly criticizing their employer's policies. *Bd. of Cnty. Comm'rs v. Umbehr*, 518 U.S. 668, 674-75 (1996); *Barrett v. Harrington*, 130 F.3d 246, 264 (6th Cir. 1997). However, the United States Supreme Court has cautioned against determining whether a right is clearly established in Section 1983 litigation based on broad legal generalities. *Anderson v. Creighton*, 483 U.S. at 639-40. Plaintiffs seeking to establish that their constitutional right is clearly established must support their claim with cases involving circumstances fairly similar to their own. While they need not find "a case on all fours," 2 Nahmod § 8:18, at 8-76, the contours of their asserted right "must be sufficiently clear that a reasonable official would understand that what he [or she] is doing violates the right." *Anderson v. Creighton*, 483 U.S. at 640.

Even in novel circumstances,[33] a public official violates a clearly established right only when "in the light of pre-existing law the unlawfulness [of the official's conduct is] apparent" or the official otherwise has "'fair warning' that his [or her] conduct deprived his [or her] victim of a constitutional right." *Hope v. Pelzer*, 536 U.S. at 739-40; 2 Nahmod § 8:18, at 8-76. When deciding whether a constitutional right was clearly established, "[t]he real question is: would a reasonable official conclude that what he or she is doing (the particularized facts) is a violation of a constitutional right." 4 Rotunda & Nowak § 19.29(a), at 587.

Public officials cannot "reasonably be expected to anticipate subsequent legal developments" or "that the law forbade conduct not previously identified as unlawful." *Harlow v. Fitzgerald*, 457 U.S. at 818. Accordingly, public "[o]fficials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992) (citing *Anderson v. Creighton*, 483 U.S. at 639-40). For these reasons, "[t]he [United States] Supreme Court's focus on specific facts surrounding the challenged conduct and the need to balance competing interests makes it especially difficult for plaintiffs to defeat the qualified immunity defense in the First Amendment context." 2 Bodensteiner & Levinson § 1A:10, at 1A-252.

The undisputed facts reflect that Ms. Battle's criticism of the night locker policy arose initially from personal concerns about her nursing license and the possibility of personal liability. Eventually, Ms. Battle added concerns for patient safety to her other, more personal concerns. Because of the mixture of personal and public concerns reflected in Ms. Battle's statements, the MTMHI defendants were not on notice that the conduct regarding Ms. Battle

---

[33]*See* 2 Bodensteiner & Levinson § 1A:8, at 1A-152 (quoting *Hope v. Pelzer*, 536 U.S. at 740-42).

violated her clearly established First Amendment rights. Because pre-existing law did not clearly establish the boundaries of Ms. Battle's First Amendment rights in the context of this case, we decline to hold that the MTMHI defendants should have known that Ms. Battle's statements were protected by the First Amendment because she was speaking on a matter of public concern.

## C.

Finally, even if Ms. Battle's criticism of the night locker policy involved a matter of public concern, she cannot recover damages under Section 1983 unless she can demonstrate the MTMHI defendants retaliated by taking some form of adverse employment action against her. *See* 1 Bodensteiner & Levinson § 1:10, at 1-324. Ms. Battle has recited a litany of actions taken by the MTMHI defendants that she believes to be adverse to her. We have concluded, however, that the essentially undisputed evidence, viewed in Ms. Battle's favor, does not demonstrate that any of the actions of the MTMHI defendants adversely affected Ms. Battle's employment status in a permanent or material way.

The standard for determining whether the conduct of a governmental employer amounts to an adverse employment action is broader in the context of a Section 1983 claim for violation of First Amendment rights than in other contexts. *Rivera-Jiménez v. Pierluisi*, 362 F.3d 87, 94 (1st Cir. 2004); *Spiegla v. Hull*, 371 F.3d 928, 941 (7th Cir. 2004); 1 Bodensteiner & Levinson § 1:10, at 1-276 to -282. The United States Court of Appeals for the Sixth Circuit has noted that less drastic employment actions that are de minimis, inconsequential, or trivial do not implicate the First Amendment. *See Brown v. Crowley*, 312 F.3d 782, 801 (6th Cir. 2002) (citing *Thaddeus-X v. Blatter*, 175 F.3d 378, 398 (6th Cir. 1999)); *See generally* 1 Schwartz § 3.11[C][1], at 3-352.3 to -352.4. However, even trivial employment actions, taken in the aggregate, can provide a basis for a Section 1983 claim for violating a government employee's First Amendment rights. *Cf. Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 399 (6th Cir. 2010); *Akins v. Fulton Cnty.*, 420 F.3d 1293, 1301-02 (11th Cir. 2005). The pivotal question is whether the employment action or actions were reasonably likely to chill a government employee's speech. 1 Bodensteiner & Levinson, § 1:10, at 1-276 to -282; *see also Fann v. Brailey*, 841 S.W.2d 833, 836 (Tenn. Ct. App. 1992) (citing *Gibson v. United States*, 781 F.2d 1334, 1338 (9th Cir. 1986)).

The undisputed facts in this record, even when viewed in a light favorable to Ms. Battle, fail to demonstrate that the MTMHI defendants acted in any way toward Ms. Battle that materially or permanently affected her employment. The seven actions relied upon by Ms. Battle to support her retaliation claim, considered individually or in the aggregate, do not amount to the sort of injuries that support a Section 1983 claim.

Ms. Battle alleges that her coworkers teased her and disparaged her but concedes that she did not report these incidents to her superiors. She did not name any of these employees as defendants and did not allege that the persons she named as defendants directly precipitated this conduct. Public officials "cannot be held responsible for the actions of subordinates based merely on a theory of vicarious liability or respondeat superior." 1 Bodensteiner & Levinson § 1:5, at 1-82 to -83.

Ms. Battle also alleges that she received only a four-star "superior" performance evaluation after she gave an unauthorized interview about the night locker policy to a television reporter. However, when she took issue with this evaluation, MTMHI promptly reconsidered it and gave Ms. Battle a five-star "exceptional" evaluation. The employee who gave Ms. Battle the "superior" evaluation conceded that she had not been aware that MTMHI had promised Ms. Battle that there would be no employment consequences for her challenge to the night locker policy before the Board of Nursing.

Ms. Battle also complains that Commissioner Betts sent her a letter of commendation for the way that she was managing the night locker. We are at a loss to understand how a letter of commendation could be considered an adverse employment action, particularly when Ms. Battle herself testified that she was managing the night locker appropriately.

In addition, Ms. Battle alleges that the MTMHI defendants and others set out to require her to perform tasks that she would refuse to perform in order to provide pretextual grounds to terminate her. The only specific example of this conduct involved a staff meeting with the executive director of the Board of Nursing. After the executive director told the nursing staff that the night locker policy was appropriate, an MTMHI official stated that nurses who did not want to comply with the new policy "could look for other employment." When viewed in the context in which it was made, this statement differs from the threats of termination that other courts have found to be an adverse employment action for the purpose of a Section 1983 claim. Here, it was entirely reasonable for MTMHI to expect that the nurses would adhere to the night locker policy after the executive director of the Board of Nursing had assured them that the night locker policy was appropriate and that following it would not jeopardize their nursing licenses.

Ms. Battle also points to the instructions she received from the MTMHI grievance review officer to bypass the normal grievance procedures and to send her grievances about the night locker policy directly to Commissioner Betts. We find little in the grievance review officer's conduct to criticize because she was following the Commissioner's directions and because the Commissioner had already determined that the night locker policy was not grievable.

Finally, Ms. Battle complains that MTMHI moved her office and that she was temporarily prevented from creating the weekly schedules for her subordinates. When considered in the context of the undisputed facts, these actions are trivial. MTMHI moved Ms. Battle's office to one closer to the night locker because she was responsible for the night locker. MTMHI temporarily reassigned Ms. Battle's responsibility for preparing schedules because of a concern that Ms. Battle was altering the schedules to accommodate Ms. King's absences from work. Once the matter was resolved, the responsibility for preparing the work schedules was returned to Ms. Battle.

Ms. Battle has failed to present evidence of an adverse employment action that is sufficient to raise the specter of First Amendment retaliation. Even when viewed in the aggregate over the lengthy duration of this dispute, MTMHI's actions were de minimis and not otherwise retaliatory. Not only is there no evidence that these actions were undertaken to chill Ms. Battle's First Amendment rights, there is no evidence that they had that effect insofar as Ms. Battle is concerned. She continued to voice her objections to the night locker policy both internally and publicly. Accordingly, we find that the undisputed evidence does not support a finding that the actions of the MTMHI defendants with regard to Ms. Battle's criticisms of the night locker policy rise to the level that would support a retaliation claim under Section 1983.

## VIII.

Even though Section 1983 claims turn on the particular facts and circumstances of each case, a public official's claim of qualified immunity is ultimately a question that the courts themselves must address. Based on our consideration of this record, we have determined that the Court of Appeals erred when it reversed the trial court's conclusion that the MTMHI defendants were entitled to qualified immunity. Accordingly, we reverse the judgment of the Court of Appeals and affirm the judgment of the trial court. The case is remanded to the trial court for any further proceedings consistent with this opinion. We tax the costs of this appeal to Patricia Battle for which execution, if necessary, may issue.

_____
WILLIAM C. KOCH, JR., JUSTICE

# IN THE SUPREME COURT OF TENNESSEE
## AT NASHVILLE
February 2, 2011 Session

## DOROTHY KING ET AL. v. VIRGINIA BETTS ET AL.

**Chancery Court for Davidson County**
**No. 06-943-I**

---

**No. M2009-00117-SC-R11-CV - Filed on November 18, 2011**

---

## JUDGMENT

This cause came on to be heard upon the record on appeal from the Court of Appeals, the briefs of the parties, and the arguments of counsel. Upon consideration of the entire record, this Court finds and concludes that the judgment of the Court of Appeals should be reversed.

In accordance with the opinion filed contemporaneously with this judgment, it is, therefore, ordered, adjudged, and decreed that the judgment of the Court of Appeals be and is hereby reversed. The cause be remanded to the trial court for further proceedings consistent with this Court's opinion.

It is further ordered that the costs of this appeal be taxed to Patricia Battle for which execution, if necessary, may issue.